2016 IL App (1st) 152662

FIRST DIVISION
October 11, 2016

No. 1-15-2662

|  |  |  |
|---|---|---|
| BABBITT MUNICIPALITIES, INC., | ) | Appeal from the |
|  | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County, |
|  | ) |  |
| v. | ) | No. 14 CH 08460 |
|  | ) |  |
| HEALTH CARE SERVICE CORPORATION, | ) | Honorable |
| an Illinois Mutual Legal Reserve Company, | ) | Neil H. Cohen, |
| d/b/a Blue Cross Blue Shield of Illinois, | ) | Judge Presiding. |
|  | ) |  |
| Defendant-Appellee. | ) |  |
|  | ) |  |

JUSTICE MIKVA delivered the judgment of the court, with opinion.
Presiding Justice Connors and Justice Harris concurred in the judgment and opinion.

**OPINION**

¶ 1    This is an appeal from the circuit court's dismissal of claims for breach of contract and declaratory judgment brought by plaintiff, Babbitt Municipalities, Inc. (Babbitt), against defendant, Health Care Service Corporation (HCSC). Babbitt alleged that HCSC had a duty, pursuant to its originating documents, to act as a not-for-profit company for the mutual benefit of its policyholder-members. Babbitt alleged that HCSC breached this duty by accumulating a large cash surplus, rather than spending any amount exceeding a reasonable reserve for the benefit of its members. Concluding that Babbitt's second amended complaint failed to cure the defects identified in its prior pleadings, the circuit court dismissed Babbitt's claims with prejudice pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 2-615 (West 2014)). The court determined that Babbitt did not adequately allege a specific contractual provision that

HCSC breached, a concrete injury, an actual controversy based on HCSC's present conduct, or facts that, if proved, would rebut the presumption of good faith afforded by the business judgment rule. For the more limited reasons that follow, we affirm the judgment of the circuit court.

¶ 2                              BACKGROUND

¶ 3    Defendant, Health Care Service Corporation (HCSC), is an Illinois mutual legal reserve insurance company—a not-for-profit company owned by its policyholder-members—operating as a licensee of Blue Cross and Blue Shield (BCBS). Plaintiff, Babbitt Municipalities, Inc. (Babbitt), is one of HCSC's policyholder-members.

¶ 4    HCSC's "Amended and Restated Articles of Incorporation" (Articles) state that "[t]he object for which [HCSC] is founded is to do all things necessary, proper or convenient for the purpose of promoting, establishing, maintaining and operating a non-profit health care service plan as authorized by the laws of the State of Illinois." In accordance with this stated objective, HCSC's "Amended and Restated By-Laws" (Bylaws) set forth the companies "purposes":

> "(a)    To do all things necessary, proper or convenient for the purpose of promoting, establishing, maintaining and operating a mutual health care insurance company as authorized by applicable laws ***;
>
> (b)    To do all things necessary, proper or convenient for the purpose of promoting, establishing, maintaining and operating said mutual health care insurance company and any other business activity reasonably complementary or supplementary to its insurance business; and

(c)     To engage in any lawful act or activity in which a

mutual insurance company may engage under applicable laws."

¶ 5     HCSC's Bylaws also state that the company "shall operate on a not-for-profit basis for the mutual benefit of its Members" and "[n]o person or entity shall receive, directly or indirectly, any profits from [HCSC]." The Bylaws further provide, however, that "[c]ompensation for services performed or reimbursement for reasonable expenses shall not be considered profit." Compensation of the company's officers is "fixed from time to time by the Board of Directors," and compensation of all other executives is determined by the president and CEO pursuant to compensation policies approved by the board's compensation committee.

¶ 6     Babbitt filed three successive complaints in this matter, asserting claims for both breach of contract and declaratory judgment based on the above provisions. Babbitt's initial complaint relied on slightly different legal theories and is not at issue in this appeal. The allegations summarized here are those contained in Babbitt's second amended complaint for declaratory judgment, as well as allegations from its first amended complaint that were incorporated by reference in its claim for breach of contract, which Babbitt preserved for review.

¶ 7     Babbitt alleged that HCSC failed to live up to its stated purpose of operating as a not-for-profit company for the benefit of its members, and in fact acted contrary to this goal, by "stockpiling (rather than using) profits." In support of this allegation, Babbitt cited HCSC's financial statements indicating that the company's combined net income from operations for the years 2009 through 2013 totaled over $4 billion. According to Babbitt, HCSC "branch[ed] out and conduct[ed] activities separate and apart from its mission" by, for example, generating "enormous fees" for the administration of its members' health care benefits and using its "ever-increasing accumulation of profits" to "expand its business operation without corresponding

3

mutual benefit to its members." Babbitt alleged that, by the end of 2013, HCSC had accumulated $10.29 billion.

¶ 8     Babbitt further alleged that the surplus earnings retained by HCSC were excessive when compared with certain fiscal benchmarks. Babbitt alleged, for example, that "under an exceedingly conservative standard previously used by [BCBS] Plans[,] there was no need to set aside profits equal to more than three months [*sic*] worth of expenses, as that amount would cover nearly any conceivable financial contingency." According to Babbitt, HCSC historically kept a surplus of about twice that amount. Babbitt also alleged that a comparison of HCSC's assets in relation to the amount and type of risk it faced resulted in "Risk Based Capital levels *** three times higher than internal BCBS standards, four times higher than Federal Affordable Care Act and leading actuarial suggested guidelines, and over *ten times* higher than minimum regulatory standards" (emphasis in original), the latter of which are used to determine when control of a company should be ceded to regulators.

¶ 9     Babbitt additionally alleged that HCSC's reserves were excessive when compared with those held by other nonprofit companies like California Blue, which recently pledged to cap its net income at 2% of revenue, and Wellmark, Inc., a plan operating in Iowa and South Dakota, which recently "announced a corporate philosophy and goal of zero profit for the mutual benefit of its policyholder-owners."

¶ 10     According to Babbitt, HCSC's executives stood to gain from the company's retention of surplus earnings. Babbitt noted, for example, that HCSC's CEO Patricia Hall received total compensation of $16 million in 2012 (including $14.9 million in bonuses) and $11.2 million in 2013 (including $10 million in bonuses). Between 2011 and 2013, Babbitt alleged that "the top ten executives at HCSC ha[d] earned nearly 96 million in bonus money." Babbitt further alleged

that HCSC "established a corporate structure with a primary profit motive" and incentivized the accumulation of excess profit by tying its executives' compensation to "membership growth and earnings growth," an action Babbitt claimed violated prohibitions on profit sharing in the company's Bylaws.

¶ 11    Rather than retaining excess earnings, Babbitt alleged that HCSC had a duty to use any funds in excess of a reasonable reserve for the benefit of its members by, for example, "lowering its policyholders-members' [*sic*] deductibles and co-pays, providing free generic drugs, providing free or enhanced health and wellness programs, or enhancing the policyholder-members' benefits for certain critical and/or underfunded healthcare needs." As a policyholder-member of HCSC since 2009, Babbitt sought to represent a class of other, similarly situated entities that it alleged had thus been harmed in "tangible ways" and "deprived of the benefits owed to them under [HCSC's] Articles and Bylaws."

¶ 12    In support of its claim for breach of contract, Babbitt alleged that HCSC's Articles and Bylaws constitute binding contracts between HCSC and its policyholder-members, pursuant to which those members pay premiums in exchange for health insurance services. Babbitt further alleged that the Articles and Bylaws establish "three principle duties" with which HCSC is bound to comply: the duty to operate (1) "as a nonprofit entity," (2) "for the mutual benefit of its Members," and (3) "with no distribution of *any* profit to *anyone*." (Emphasis in original.) Babbitt contended that HCSC breached these duties by "adopt[ing] a financial plan dedicated to accumulating as much excess profit as possible," pursuant to which it "regularly earned hundreds of millions, and in some cases billions, of dollars in yearly profits." As a result, Babbitt alleged, HCSC's policyholder-members were "deprived of some $5 billion worth of improved health care."

¶ 13    Babbitt also sought declarations, pursuant to section 2-701 of the Code (735 ILCS 5/2-701 (West 2014)), that HCSC's Articles and Bylaws impose a duty on HCSC to act both "in a manner consistent with a nonprofit corporation" and "as a mutual legal reserve company for the mutual benefit of its Members;" that the Articles and Bylaws "provide standards of conduct" and "specify the manner in which HCSC must act to be in accordance with th[ese] dut[ies];" and that HCSC "[wa]s not currently operating as a nonprofit corporation" or "as a mutual legal reserve company for the mutual benefit of its Members, consistent with its Articles and Bylaws." According to Babbitt, a "current and continuing threat" existed "that HCSC w[ould] continue to ignore the terms of its Articles and Bylaws."

¶ 14    Babbitt further asserted that "HCSC's profit-seeking behavior was not the result of its executives making informed business decisions in the company's best interest," but rather, that "its profit-seeking behavior was a plain example of bad faith and self-dealing." According to Babbitt and the expert witnesses whose affidavits Babbitt attached to its complaint, the surplus held by HCSC was "clearly excessive," had "no actuarial justification," and was indeed so high that it could not be the result of an honest mistake or inadvertence. Babbitt asserted that HCSC's "profit accumulation [wa]s so far beyond what could reasonably be necessary to protect against solvency risks that it must [have] be[en] driven by its executives' desire for higher bonuses."

¶ 15    On August 27, 2015, the circuit court granted HCSC's motion to dismiss Babbitt's first amended complaint pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2014)) for failure to state a claim. The court determined that Babbitt's claim for breach of contract failed because, although the complaint alleged that HCSC had behaved like a for-profit company by maintaining an unnecessarily large surplus, Babbitt failed to identify any specific provision of the company's Articles or Bylaws that prohibited HCSC's alleged conduct. The court pointed out

that "[t]here is no provision in the Articles or Bylaws that provide[s] any amount or formula regarding the surplus that may be maintained by HCSC." Noting that the Bylaws expressly provided that compensation for services performed was not considered profit, the circuit court also rejected Babbitt's allegations that the bonuses paid to HCSC's executives constituted improper profit sharing. The court further determined that Babbitt failed to adequately plead an injury resulting from the claimed breach where it alleged only that HCSC's policyholder-members incurred injuries in the amount of approximately $5 billion, but "fail[ed] to allege facts showing how this amount was calculated." Finally, the court concluded that Babbitt's claim for breach of contract was deficient because Babbitt "fail[ed] to allege any specific facts showing fraud, bad faith or self-dealing on the part of HCSC's directors" and Babbitt's conclusory allegations were insufficient to overcome the presumption of good faith afforded by the business judgment rule.

¶ 16    The circuit court also dismissed Babbitt's claim for declaratory judgment, which was based on the same facts as its claim for breach of contract, finding Babbitt had not clearly alleged the existence of a tangible legal interest. The court's dismissal of Babbitt's first amended complaint was without prejudice.

¶ 17    Babbitt filed its second amended complaint on April 27, 2015, asserting modified claims for declaratory judgment and realleging its claim for breach of contract to preserve that claim for appeal. HCSC again moved to dismiss pursuant to section 2-615 of the Code and the circuit court again granted HCSC's motion. For one of the same reasons it rejected Babbitt's earlier claim for breach of contract—the failure to allege a specific, enforceable duty established by the Articles and Bylaws that HCSC had breached—the circuit court determined that Babbitt failed to allege the existence of an actual controversy amenable to resolution by declaratory judgment. As the

7

court explained:

> "Plaintiff seeks declarations that HCSC is not operating in accordance with its Articles and Bylaws, but fails to identify any action of HCSC that is arguably contrary to any actual provision of the Articles and Bylaws. Conclusory allegations that HCSC is not acting as a proper non-profit or mutual legal reserve company are insufficient to allege an actual controversy regarding the terms of the Articles and Bylaws. Because Plaintiff has failed to identify any provision of the Articles and Bylaws which are currently in dispute, Plaintiff is effectively asking this court to render an advisory opinion as to HCSC's future conduct. This is not the purpose of declaratory judgment. [Citation.] Plaintiff has not alleged the existence of any concrete dispute between the parties capable of a definite determination by this court."

¶ 18 The circuit court also concluded, citing *Brandt Construction Co. v. Ludwig*, 376 Ill. App. 3d 94, 103 (2007), that this claim should be dismissed because "[d]eclaratory judgment is not meant to address past conduct."

¶ 19 Rejecting Babbitt's argument that it was premature to apply the business judgment rule at the pleadings stage, the circuit court again concluded that the core of Babbitt's allegations concerned its disagreement with the manner in which HCSC conducted its business. Absent specific allegations of fraud, bad faith, or self-dealing, however, those business decisions were protected by the business judgment rule. The court rejected as unsupported Babbitt's argument that the business judgment rule did not apply to claims for declaratory judgment. Because

Babbitt had failed to remedy the deficiencies in its allegations after three attempts, the circuit court dismissed Babbitt's second amended complaint with prejudice.

¶ 20                                    JURISDICTION

¶ 21    The circuit court entered its final order dismissing Babbitt's claims with prejudice on August 27, 2015. Babbitt timely filed its notice of appeal on September 18, 2015. We therefore have jurisdiction pursuant to Illinois Supreme Court Rules 301 and 303 governing appeals from final judgments entered below. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. May 30, 2008).

¶ 22                                    ANALYSIS

¶ 23    Our review of an order granting a motion to dismiss is *de novo*. *Neppl v. Murphy*, 316 Ill. App. 3d 581, 583 (2000). A motion to dismiss brought pursuant to section 2-615 of the Code is a facial challenge to the sufficiency of the complaint. 735 ILCS 5/2-615 (West 2014); *Oliviera v. Amoco Oil Co.*, 201 Ill. 2d 134, 147 (2002). We must accept as true all well-pleaded facts and draw all reasonable inferences in the plaintiff's favor. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). Because Illinois is a fact-pleading jurisdiction, however, a plaintiff must make sufficient factual allegations to bring its claim within a legally recognized cause of action. *Marshall*, 222 Ill. 2d at 429-30. Unsupported conclusions of law or fact are thus not taken as true and not considered. *In re Estate of DiMatteo*, 2013 IL App (1st) 122948, ¶ 58.

¶ 24    On appeal, Babbitt contends the circuit court erred when it determined that Babbitt failed to state a claim for breach of contract or declaratory relief. Contrary to the court's findings, Babbitt insists that the statements of purpose set out in HCSC's Articles and Bylaws establish a definite and enforceable duty requiring HCSC's officers and directors to operate the company as a not-for-profit company and to spend any surplus beyond a reasonable reserve for the mutual benefit of HCSC's members. Babbitt additionally argues that it is not required to calculate

9

damages to survive a motion to dismiss, but may instead make general allegations of harm to HCSC's members. Also, Babbitt asserts that it has alleged an "actual controversy" that is the proper subject of an action for declaratory judgment (*i.e.*, a declaration specifying what HCSC's Articles and Bylaws require it to do, if anything, with net earnings) and that such a declaration, though based on HCSC's past conduct, would serve to determine the parties' rights going forward. Finally, Babbitt contends that the business judgment rule—a basis for dismissal relied on by the circuit court in connection with both of Babbitt's claims—does not apply to these claims for breach of contract and for a declaratory judgment and that, even if it does, Babbitt alleged sufficient facts to rebut the rule's presumption that HCSC's officers or directors exercised their business judgment in good faith.

¶ 25    In response, HCSC argues that the circuit court properly dismissed Babbitt's claims for the reasons stated in the court's orders. We consider the two claims and each basis the court gave for dismissal in turn.

¶ 26                                A. Breach of Contract

¶ 27    "The essential elements of a breach of contract are: (i) the existence of a valid and enforceable contract, (ii) performance by the plaintiff, (iii) breach of the contract by the defendant, and (iv) [a] resultant injury to the plaintiff." *Batson v. Oak Tree, Ltd.*, 2013 IL App (1st) 123071, ¶ 35.

¶ 28    In this case, it is clear that the contractual relationship between HCSC and its policyholder-members is defined, in part, by the company's Articles and Bylaws. See *Lubin v. Equitable Life Assurance Society of the United States*, 326 Ill. App. 358, 365 (1945) ("the rights and interests of policyholders in the assets of a mutual life insurance company are contractual in nature and are measured by their policies and by the statutes, charter and by-laws, if any, which

10

comprise the terms of their contract"). HCSC furthermore does not allege that Babbitt failed to perform any part of the parties' agreement. Thus, the first two elements of a breach of contract claim are clearly met. The parties disagree, however, regarding whether Babbitt sufficiently alleged that HCSC breached the parties' contract or identified damages flowing from that breach.

¶ 29     "To be enforceable, the material terms of a contract must also be definite and certain." *Szafranski v. Dunston*, 2015 IL App (1st) 122975-B, ¶ 67. Babbitt recognizes that this is necessary to provide the circuit court with a "basis for deciding whether the agreement has been kept or broken." *Halloran v. Dickerson*, 287 Ill. App. 3d 857, 868 (1997). Babbitt nevertheless argues that it was sufficient for it to allege that HCSC breached its general obligation to act as a not-for-profit mutual insurance company. Babbitt insists that "[t]he Court need not worry, at this stage, about determining precisely what that obligation means for the parties" because "[d]evelopment of the factual record will illuminate the character and extent of HCSC's breach." We disagree. Illinois is a fact-pleading jurisdiction; "a plaintiff must allege facts," not merely conclusions, "that are sufficient to bring his claim within the scope of a legally recognized cause of action." *Teter v. Clemens*, 112 Ill. 2d 252, 256 (1986). Moreover, the broadly worded statements of purpose in HCSC's Articles and Bylaws that Babbitt relies on are too indefinite to enforce by way of a claim for breach of contract because those provisions do not impose upon HCSC a specific, legally enforceable duty to limit the amount of the company's reserve fund or to take any specific action with respect to its net earnings.

¶ 30     If the contract terms are too uncertain or indefinite to enforce, allegations of a breach of those terms will not provide a basis for a breach of contract claim. Compare *Wait v. First Midwest Bank/Danville*, 142 Ill. App. 3d 703, 708 (1986) (holding the plaintiff alleged an enforceable agreement to loan money in the future where he alleged that the parties agreed on the

amount to be loaned, how the interest rate would be computed, and the fact that payments would be made on a periodic basis), with *Champaign National Bank v. Landers Seed Co.*, 165 Ill. App. 3d 1090, 1094 (1988) (holding, as a matter of law, that a lender's agreement with a borrower that the lender would not collect on a promissory note "as long as [the parties] ma[d]e progress toward profitability" and "had a chance at profitability" (internal quotation marks omitted) was unenforceable because, as the court noted, "[w]ho is to judge the element of 'progress towards profitability' or the element of 'chance of profitability?' ").

¶ 31    This is exactly what the circuit court in this case recognized when it observed that "[t]here is no provision of [HCSC's] Articles or Bylaws that provide any amount or formula regarding the surplus that may be maintained by HCSC." Babbitt insists that this observation is "beside the point" because "[t]he proper inquiry is whether HCSC is using its money for the mutual benefit of [its] members." Babbitt has not alleged, however, that the company spends *none* of its money for the mutual benefit of its members. The gravamen of Babbitt's complaint is instead that HCSC spends some money on its members, just not enough. The parties' contract, however, does not indicate what "enough" spending would be in this context, beyond the unhelpful general proposition that HCSC is intended to operate as a not-for-profit mutual reserve insurance company. See *Szafranski*, 2015 IL App (1st) 122975-B, ¶ 67 ("a court [must be] able to ascertain what the parties agreed to, using proper rules of construction and applicable principles of equity" (internal quotation marks omitted)).

¶ 32    Babbitt admits that what constitutes "enough" spending in this context does not lend itself to a ready determination. Babbitt posits that the "goal" of a mutual insurance company is to provide insurance "substantially at cost," but also points out that the qualifier "substantially" is necessary because "[n]o one *** expects clairvoyance" and "some play in the joints is

12

necessary" when assessing a company's efforts to achieve this goal. The sort of vague, aspirational language, that Babbitt relies on for its breach of contract claim, however, does not define a specifically enforceable contractual duty.

¶ 33    In an attempt to fill this void and supply its own definition of "enough" spending, Babbitt included in its complaint its own experts' recommendations and allegations regarding the actions taken by other insurers. These statements tell the court nothing, however, about what the parties to this dispute agreed to or what the contract terms mean. Indeed, by comparing the reserve held by HCSC with those held by other health care organizations that have specifically pledged to cap their net income at a certain percentage of revenue, Babbitt underscores what is missing here. HCSC's Articles and Bylaws contain no such pledge or definite promise that could be enforced by a court.

¶ 34    Babbitt's argument appears to be that the reserve held by HCSC is so overwhelmingly excessive that a breach of the duty to act as a not-for-profit mutual reserve company is apparent and the court need not concern itself at this juncture with precisely how excessive the reserve is. Taken as true in the light most favorable to Babbitt, however, the allegations in this case at most establish that HCSC's reserves have exceeded various *minimum* requirements set by regulators or the BCBS internal standards. Nowhere does Babbitt allege the existence of any requirement regarding the maximum reserve that may be held by a mutual insurance company, except to cite its own experts' conclusions. In sum, Babbitt may have alleged a general duty, but not one specific enough to enforce in an action for breach of contract.

¶ 35    The cases that Babbitt cites do not persuade us otherwise. Babbitt cites *Penn Mutual Life Insurance Co. v. Lederer*, 252 U.S. 523 (1920), for the proposition that "HCSC's obligation to act for the mutual benefit of its members is clearly ascertainable, as it has been recognized by the

13

courts for decades." *Penn Mutual* was not a breach of contract case, but one in which a mutual insurance company sought to recover income tax collected on dividends paid to its members that it asserted did not comprise part of the company's income. *Penn Mutual*, 252 U.S. at 524. Although the Supreme Court in that case did note that "[i]t is of the *essence* of mutual insurance that the excess in the premium over the actual cost as later ascertained shall be returned to the policy holder" (emphasis added), it also recognized that the premiums charged by such companies are intentionally greater than the expected cost of insurance because "the redundancy in the premium furnishes the guaranty fund out of which extraordinary losses may be met." *Id.* at 525. The Court's decision in *Penn Mutual* noted both that the payment of dividends by a mutual insurance company was an act within the discretion of the company or its board of directors (*id.* at 527 n.4) and that the amount of premiums set aside to establish a reasonable reserve varied "greatly" from year to year and company to company, particularly where "the margin between the probable losses and those reasonably possible [was] very large" (*id.* at 525 n.2). Thus, far from establishing a clear contractual duty on the part of a mutual insurance company to spend its surplus when a specific reserve has been achieved, *Penn Mutual* highlights the reasons why such matters are typically left to the discretion of the company's board of directors.

¶ 36    Babbitt also cites *Indianapolis Life Insurance Co. & Subsidiary v. United States*, 940 F. Supp. 1370 (S.D. Ind. 1996), *aff'd*, 115 F.3d 430 (7th Cir. 1997), to support its argument that HCSC had an obligation to act for the benefit of its member-policyholders. That was also a tax case, not a breach of contract claim. In determining what constituted taxable income of a mutual life insurance company, the court confirmed Babbitt's point that a mutual life insurance company is owned by and supposed to act for the benefit of its policyholders. *Indianapolis Life Insurance Co.*, 940 F. Supp. at 1371-72. However, this does nothing to support Babbitt's effort to enforce

the contractual rights it asserts exist in this case.

¶ 37　Babbitt argues that, if HCSC's duties to act as a not-for-profit company and for the mutual benefit of its members are not specifically enforceable terms of the parties' agreement, then those provisions might as well not exist, a result it claims is inconsistent with the general rule that "[a] court will not interpret a contract in a manner that would nullify or render provisions meaningless" (*Thompson v. Gordon*, 241 Ill. 2d 428, 442 (2011)). Although it is true that a contract "should be construed, *if possible*, so that no clause or sentence is rendered superfluous" ((emphasis added) (*Wigod v. Chicago Mercantile Exchange*, 141 Ill. App. 3d 129, 132 (1986)), it is equally true that, "[w]here certainty is lacking in the essential terms of [a] contract, the court will not supply the missing essential terms" (*O'Neil & Santa Claus, Ltd. v. Xtra Value Imports, Inc.*, 51 Ill. App. 3d 11, 14 (1977)).

¶ 38　Because we conclude that Babbitt failed to allege that HCSC breached a legally enforceable duty defined in the parties' agreement, we need not consider whether Babbitt sufficiently alleged damages resulting from that alleged breach.

¶ 39　　　　　　　　　　　B. Declaratory Judgment

¶ 40　Babbitt also sought binding declarations that, in contravention of HCSC's Articles and Bylaws, the company was "not currently operating as a nonprofit corporation" or "as a mutual legal reserve company for the mutual benefit of its Members." The circuit court dismissed these claims, finding Babbitt's inability to point to a specific provision of the Articles or Bylaws that HCSC had violated and Babbitt's allegations concerning only HCSC's past conduct did not support the existence of an actual controversy between the parties.

¶ 41　We agree with Babbitt that the allegations here are not necessarily barred by the prohibition, which the trial court noted, citing *Brandt Construction Co. v. Ludwig*, 376 Ill. App.

3d 94 (2007), that "[d]eclaratory judgment is not meant to address past conduct." As in *Brandt*, the parties here have an ongoing relationship and thus a declaratory judgment action might be appropriate to guide their future conduct.

¶ 42    However, there still must be an actual controversy, and as the circuit court noted, the problem remains that Babbitt cannot point to a provision of the Articles or Bylaws under which it can ask the court to declare that HCSC has specific obligations.

¶ 43    Section 2-701 of the Code provides that a circuit court may, "in cases of actual controversy, make binding declarations of rights, having the force of final judgments." 735 ILCS 5/2-701 (West 2014). Although the declaratory judgment statute is "liberally construed and should not be restricted by unduly technical interpretations" (*First of America Bank, Rockford, N.A. v. Netsch*, 166 Ill. 2d 165, 174 (1995)), its application must still comport with the general rule that "[c]ourts cannot pass judgment on mere abstract propositions of law, render advisory opinions, or give legal advice as to future events" (*Shipp v. County of Kankakee*, 345 Ill. App. 3d 250, 255 (2003)). Declaratory relief is therefore only proper if there is an actual legal controversy between the parties, *i.e.*, if there is "a concrete dispute admitting of an immediate and definite determination of the parties' rights, the resolution of which will aid in the termination of the controversy or some part thereof." *Underground Contractors Ass'n v. City of Chicago*, 66 Ill. 2d 371, 375 (1977).

¶ 44    Although Babbitt insists that "[t]he parties actively dispute whether HCSC's governing documents require the company to spend a portion of its surplus on its member-policyholders," Babbitt did not allege that HCSC has refused to spend *any* money for its members' benefit. Instead, the parties' dispute centers on *what portion* of any surplus the company is obligated to spend. No disputed provision of the parties' contract, however, sheds any light on this

16

determination. Thus, just as Babbitt alleged a contractual duty that was not definite and enforceable, it alleged a controversy incapable of "immediate and definite determination" (*Shipp*, 345 Ill. App. 3d at 255) and not "susceptible of accurate determination" (*Howlett v. Scott*, 69 Ill. 2d 135, 144 (1977)).

¶ 45 That the same flaw requires the dismissal of both claims is unsurprising, given that the declaratory judgment statute was designed to expand the scope of available relief available to litigants, not to create any new substantive rights. *Goldberg v. Valve Corp. of America*, 89 Ill. App. 2d 383, 388 (1967). Here, Babbitt failed to identify an enforceable duty that HCSC breached in the past and likewise failed to identify such a duty going forward that HCSC was likely to breach absent a judicial declaration of rights.

¶ 46                                     C. Business Judgment Rule

¶ 47 We do not think that the business judgment rule provided an alternative basis for dismissing Babbitt's claims. "The business judgment rule is a presumption that directors of a corporation make business decisions on an informed basis, in good faith, and with the honest belief that the course taken [i]s in the best interests of the corporation." *Ferris Elevator Co. v. Neffco, Inc.*, 285 Ill. App. 3d 350, 354 (1996). Although the presumption can serve as a complete defense in some cases, it is not an affirmative defense that must be asserted by a defendant. *Ferris*, 285 Ill. App. 3d at 355. Rather, it is a rebuttable presumption that arises as a matter of law; the burden is thus on the plaintiff to present sufficient evidence to rebut it. *Id.* In the context of a section 2-615 motion to dismiss, this means that a plaintiff alleging injury as a result of a business decision made by a company's board of directors must plead facts that, if proved, would rebut the presumption. See *Stamp v. Touche Ross & Co.*, 263 Ill. App. 3d 1010, 1017-18 (1993) (affirming dismissal of claims for negligence and breach of fiduciary duty where the plaintiff's

complaint questioned the business decisions of the board of directors but contained no allegations to counter the presumption). Accordingly, where the rule applies, allegations that the company's directors acted fraudulently, illegally, in bad faith, while under a conflict of interest, or without due care and proper diligence are "facts, the existence of which are necessary to enable a plaintiff to recover." *Stamp*, 263 Ill. App. 3d at 1018.

¶ 48 In this case, the circuit court concluded that the business judgment rule applied to both Babbitt's claim for breach of contract and its claims for declaratory relief. The parties dispute whether the business judgment rule can apply to such claims and also, if it does, whether Babbitt alleged sufficient facts to overcome the presumption in this case.

¶ 49 Although Babbitt "does not concede the rule's application" in connection with either claim, it cites authority only for the proposition that the rule "is no defense to a breach of contract claim." (Internal quotation marks omitted.) *Willmschen v. Trinity Lakes Improvement Ass'n*, 362 Ill. App. 3d 546, 551 (2005). In *Willmschen*, residential homeowners sued their property association and its board of directors, alleging that those parties breached covenants calling for them to maintain common areas, including portions of lakes that the homeowners alleged had been allowed to fill with "noxious vegetation and algae." *Willmschen*, 362 Ill. App. 3d at 548. The circuit court dismissed the homeowners' breach of contract claims, finding they were defeated by the business judgment rule. *Id.* at 549. The appellate court reversed in part, noting that the rule is typically applied in cases where relief is sought against individual board members for "mismanagement *per se*" and not where the corporation itself is sued for breach of contract. *Id.* at 550-51. Quoting the New York case *Dinicu v. Groff Studios Corp.*, 257 690 N.Y.S.2d 220, 221-22 (N.Y. App. Div. 1999), the *Willmschen* court noted that, although " 'it may be good business judgment to walk away from a contract, *** this is no defense to a breach

of contract claim.' " *Willmschen*, 362 Ill. App. 3d at 551.

¶ 50    HCSC relies on *Hill v. State Farm Mutual Automobile Insurance Co.*, 83 Cal. Rptr. 3d 651 (Cal. Ct. App. 2008), a more recent California case applying Illinois law, where the court distinguished *Willmschen* and applied the business judgment rule. In *Hill*, policyholders sued their auto insurer, alleging it breached its contractual duties by amassing larger-than-necessary surpluses, which had the effect of reducing the dividends paid to the policyholders. *Hill*, 83 Cal. Rptr. 3d at 657. The trial court granted summary judgment in favor of the insurer on the basis that the company's actions were protected by the business judgment rule and the appellate court affirmed. *Id.* The appellate court found cases like *Willmschen*, in which the company's contractual obligations left it with no discretion, to be inapplicable. *Id.* at 676. The contract in *Hill*, by contrast, left the insurer with discretion in the performance of its duties because it did not require the company to issue dividends in any specific amount, at any particular time, or from any particular source. *Id.* at 675.

¶ 51    The facts of this case are similar to those in *Hill*. However, in this court's view, the discretion left to HCSC under its governing documents prevents Babbitt from stating a claim for breach of contract or declaratory judgment. And, if HCSC had in fact breached an enforceable contractual obligation, we would have to agree with the court in *Willmschen* that, although "it may be good business judgment" on the part of a company's officers or directors "to walk away from a contract, *** this is no defense to a breach of contract claim" brought against the company itself. *Willmschen*, 362 Ill. App. 3d at 551. Thus, the business judgment rule does not provide an alternative basis for dismissing Babbitt's claims.

¶ 52    Affirmed.