2026 IL App (1st) 242050-U
No. 1-24-2050

SIXTH DIVISION
May 1, 2026

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| CLAIRE HENRY, | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 2022 L 00702 |
| | ) | |
| ACE HOTEL GROUP LLC, ATELIER ACE | ) | |
| LLC, ACE GROUP INTERNATIONAL LLC, and | ) | |
| ACE HOTEL CHICAGO LLC, | ) | The Honorable |
| | ) | Daniel J. Kubasiak, |
| Defendants-Appellees. | ) | Judge Presiding. |
| | ) | |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Hyman and Gamrath concurred in the judgment.

**ORDER**

*Held*: We affirm the circuit court order granting summary judgment to defendants-appellees and dismissing plaintiff-appellant's claims of breach of contract and intentional infliction of emotional distress against her former employer.

¶ 1    Plaintiff-appellant Claire Henry sued her former employer, Ace Hotel Chicago LLC (Ace Hotel) and related entities after Ace Hotel's president disseminated a company-wide email indicating that Henry would be investigated for racial discrimination but subsequently declined to announce that the investigation found no misconduct by Henry. Henry appeals from the order

granting defendants summary judgment and dismissing her second amended complaint, which contained two counts: breach of contract and intentional infliction of emotional distress (IIED).

¶ 2       We affirm the dismissal of the breach of contract claim, insofar as it was premised on the portion of the employee handbook stating that all complaints against employees would be "confidentially investigated," as there is no allegation that the substance of the investigation was not kept confidential. Further, a breach of contract claim cannot be premised on the handbook's vague and indefinite statements that complaints would be kept confidential "to the extent possible," or that employees would be treated "with dignity and respect."

¶ 3       Separately, we affirm the dismissal of the count alleging IIED. Although the defendants' actions might be regarded as careless or insensitive to Henry's reputation, they do not meet the high threshold of extreme and outrageous conduct, nor is there evidence of the requisite intent to sustain an IIED claim. We thus affirm dismissal of both counts pleaded by the operative complaint.

¶ 4                         BACKGROUND

¶ 5       Defendants operate a number of hotels, including the Ace Hotel in Chicago's West Loop (the hotel). In 2017, Henry was hired by defendants in the role as "Cultural Engineer." The parties describe this position a "akin to a community liaison between the hotel and the community." In that role, Henry helped to coordinate a number of public events.

¶ 6       Around the time that she was hired, Henry was provided a copy of the Ace Hotel "Employee Handbook" (handbook), which contained numerous sections. Under the heading "ACE HOTEL IS AN EQUAL OPPORTUNITY EMPLOYER", the handbook stated:

> "Ace Hotel treats every employee with dignity and respect. Ace
>
> Hotel strictly prohibits unlawful discrimination based on race ***

or any other consideration made unlawful by federal, state or local laws. All such discrimination is unlawful."

¶ 7   After describing Ace Hotel's policies against discrimination and harassment, the handbook provided as follows under the heading "ALL COMPLAINTS ARE INVESTIGATED":

"Any complaints will be thoroughly, objectively, and confidentially investigated. * * * All complaints will be kept confidential to the extent possible, but confidentiality cannot be guaranteed. If any wrongdoing is found to have occurred, appropriate corrective action, up to and including separation will be taken against the wrongdoer and acts of further discrimination prevented."

¶ 8   The handbook told Henry that her "first 90 days as a newly hired employee will be an introductory period" during which management would assess her compatibility. After successful completion of that introductory period, it stated that she would "become a regular employee covered by the Ace Hotel's Personal Contract. If you elect to remain an 'at-will' employee, the work rules and policies described in this document would continue to apply to you."

¶ 9   The handbook's last page was entitled "My Complete Personal Contract with Ace Hotel Chicago" and contained signature lines for the employee and "General Manager." It recited that Ace Hotel agreed "to provide [Henry] with the benefits described in the Ace Hotel Employee Handbook" after completion of the introductory period, and that Henry agreed to abide by the policies in the handbook.

¶ 10        Henry signed the handbook on or about July 3, 2017. She also checked a box indicating she wished to remain an " 'at-will' employee. However, the handbook contains no signature on the line marked "General Manager."

¶ 11        There is no dispute that, over the next few years, Henry remained employed and had generally positive performance reviews.

¶ 12        In March 2020, the hotel was closed due to the COVID-19 pandemic. As a result, numerous employees, including Henry, were furloughed. On May 11, 2020, defendants told Henry that the hotel had obtained a Payroll Protection Program loan that would allow her to return to work for a period of eight weeks. The letter advised that, absent further funding, the hotel would likely be forced to lay off Henry and other staff.

¶ 13        Following the murder of George Floyd by Minneapolis police in late May 2020, there were renewed conversations nationwide about systemic racism and the Black Lives Matter movement. In the ensuing weeks, a number of defendants' employees posted to social media accounts, criticizing the hotel for allegedly racist decisions and policies.

¶ 14        On June 12, 2020, Jesse Boles, the hotel's general manager, sent an email to all hotel staff (using the address staff.chi@acehotel.com) acknowledging concerns expressed on social media and agreeing there was "a lot of really hard work to do." Boles pledged to takes steps such as expanding the "Diversity, Equity, and Inclusion" program and participating in "Anti-racism and implicit bias education."

¶ 15        That same evening, Michael Santana, a non-managerial hotel employee, responded to Boles' email. Santana's response copied not only the hotel staff in Chicago, but also the broader company-wide email address ace.global@acehotel.com. Henry alleges that Santana's email reached approximately 1000 recipients.

¶ 16    Santana's email criticized Boles' response as inadequate because it failed to address employees' specific demands for change. Santana's email included a number of screenshots of comments left on Instagram alleging discrimination by management; none of those comments mentioned Henry. Santana's email also included a link to a change.org petition, which was entitled "Ace Hotel – Demand for Accountability." That petition stated:

> "We, employees of Ace Hotel who have experienced rampant racism, sexism and homophobia in our work environment, demand justice and accountability from Brad Wilson, CEO. * * * This is a petition on behalf of current/former employees demanding that critical steps towards creating systemic change within the Atelier Ace organization are taken now."

¶ 17    The change.org petition urged readers to view "Our list of demands" and contained a link to a separate document, entitled "Demands for Ace Hotel/ Atelier." One of those demands was: "We call for reform of the 'Cultural Engineering' department and for current head at Ace Hotel Chicago, Claire Henry, to be TERMINATED."

¶ 18    The following day, June 13, 2020, Brad Wilson, the president of Ace Hotel, responded to Santana. Wilson's response also went to the ace.global@acehotel.com recipient list. In it, Wilson thanked Santana for his feedback and stated he had reviewed the change.org petition. Wilson also stated that he "reviewed your requests and find them reasonable and appropriate."

¶ 19    Wilson's email included a response to each of the demands. Relevant to this case, Wilson stated: "We will fully investigate the 'Cultural Engineering' department and current head at Ace Hotel Chicago, Claire Henry, and if an independent investigation shows any inappropriate bias or racism we will demand her removal."

¶ 20    On June 17, 2020, Henry (through her counsel) sent a letter to defendants' counsel. The letter stated that although Henry was "not resigning", she "does not believe there is any way she can return to her job," particularly given the "defamatory petition." Counsel requested a discussion "to resolve this matter amicably."

¶ 21    In July and August 2020, defendants conducted an independent investigation that determined that Henry had *not* engaged in any inappropriate bias or racism. However, defendants did not make any announcement to their employees that Henry had been cleared of any wrongdoing. In his deposition, Wilson was asked why he did not do so. He answered that "the environment at that time was not going to accept the fact that our third-party independent findings were valid." He believed that making further reference to it "would not result in people being, like, 'Oh, Claire is cleared,'" but would instead result in a "second round of deeper attacks on Claire and others in the hotel." Wilson testified he did not recall whether Henry specifically asked him to announce the results of the investigation.

¶ 22    In late August 2020, defendants informed Henry that it was eliminating her position of "Cultural Engineer," as well as the position of "Social Media Manager," which were being consolidated into a new position. The defendants told Henry that she could apply for the new consolidated position, but she communicated that she was not interested.

¶ 23    Sometime in September 2020, Henry was presented with a severance agreement as she was cleaning out her office. The severance agreement offered to pay Henry the sum of $3930.82 in exchange for various promises, including a general release of any claims Henry might have arising from her employment. Henry declined to sign the severance agreement.

¶ 24    In January 2022, Henry filed a seven-count initial complaint, which included counts for defamation, "corporate negligence," "Willful and Wanton corporate negligence," and negligent and intentional infliction of emotional distress.

¶ 25    In early April 2022, the defendants (all of whom are represented by the same counsel) filed a motion to dismiss the original complaint. The court denied that motion but directed plaintiff to file an amended complaint. On April 29, 2022, Henry filed a first amended complaint that contained a breach of contract count, a count for IIED, and six other counts.

¶ 26    On May 31, 2022, defendants moved to dismiss the amended complaint. After that motion was briefed, on January 10, 2023, the court entered an order that dismissed certain counts with prejudice. It also dismissed the breach of contract claim and the (IIED) claim *without* prejudice, allowing Henry to replead them in a second amended complaint.

¶ 27    In February 2023, Henry filed her second amended complaint, which contained a count for breach of contract and IIED. The breach of contract count alleged that defendants breached their contract with Henry by "failing to abide by the Employee Handbook, failing to investigate complaints with confidentiality, and failing to treat [Henry] with dignity and respect."

¶ 28    In the IIED count, Henry alleged that Wilson's email to defendants' employees stating that Henry would be investigated was "extreme and outrageous conduct." She also alleged that, after the investigation, defendants' decision not to notify her "peers that Ms. Henry was investigated and found not to have engaged in racist or inappropriate bias was extreme and outrageous conduct."

¶ 29    The parties subsequently conducted depositions, including both Henry and Wilson. On April 5, 2024, defendants filed a motion for summary judgment. Henry filed her opposition on May 24, 2024.

¶ 30    On October 3, 2024, the court granted defendants' motion for summary judgment, dismissing both the breach of contract and IIED counts. With respect to the breach of contract count, the trial court found that the "Personal Contract" was enforceable and that defendants were bound to the policies stated in the handbook.

¶ 31    However, the court found that defendants did not breach such terms or policies, either through Wilson's company-wide email or the investigation. The court agreed that after Santana's email to all of defendants' staff, defendants "had an obligation to respond publicly." It found Wilson's email response indicating that an investigation would be conducted did not imply any wrongdoing by Henry but was simply "a showing of Defendants' adhering to their own policies." The court otherwise found that "although Henry alleges that she was not treated with dignity and respect, Henry fails to specially set forth actions taken by Defendants in violation of the Employee Handbook or the 'Personal Contract.' "

¶ 32    As to the IIED claim, the court agreed with defendants that there was no "extreme or outrageous behavior," with respect to either Wilson's email regarding the investigation, or the failure to announce the results of the investigation. The court found Henry failed to present evidence of any outrageous or extreme conduct. In so doing, it noted that the handbook only required defendants to keep investigations confidential "to the extent possible." The court also found that defendants were not obligated to release the results of the investigation. Rather, the court found that defendants "had a reasonable belief that they were taking legitimate action and Henry fails to present evidence to the contrary."

¶ 33                              ANALYSIS

¶ 34    On appeal, Henry contends that the trial court erred in granting summary judgment to defendants with respect to both her breach of contract claim and her IIED claim.

¶ 35    Summary judgment is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Illinois Founders Ins. Co. v. Williams*, 2015 IL App (1st) 122481, ¶ 30; 735 ILCS 5/2-1005 (West 2024). Summary judgment is a "drastic remedy," that should only be granted if the movant's right to judgment is "clear and free from doubt." *Council for Jewish Elderly v. Kurtz*, 2024 IL App (1st) 230102, ¶ 35. *De novo* review applies to the entry of summary judgment. *Illinois Founders Ins. Co.*, 2015 IL App (1st) 122481, ¶ 30. Under *de novo* review, "We may affirm on any basis in the record, whether or not the trial court relies on that basis or its reasoning was correct." *Omega Demolition Corp. v. Illinois State Toll Highway Auth.*, 2022 IL App (1st) 210158, ¶ 36.

¶ 36    As discussed below, we affirm summary judgment on the breach of contract claim, where there is no factual dispute that the investigation was kept confidential, and because the handbook's promises to keep complaints confidential "to the extent possible" and to treat employees with "dignity and respect" are too indefinite to support a breach of contract. We also affirm summary judgment dismissing the IIED claim (the only tort claim at issue), as Henry cannot show that defendants engaged in extreme and outrageous conduct or that they acted with the requisite intent or recklessness.

¶ 37                                    Breach of Contract Claim

¶ 38    As to the breach of contract claim, Henry argues that summary judgment was improper because the record presented jury questions as to whether defendants breached the Employee Handbook in two ways: (1) violating the handbook's promise to keep complaints and

investigations confidential "to the extent possible" and (2) by breaking the handbook's promise to treat her with "dignity and respect."

¶ 39　　　As to confidentiality, Henry claims there was a "clearly articulated" duty "that complaints and investigations would remain confidential to the extent possible," which was breached by Wilson's email to company employees announcing that Henry would be investigated. Henry's brief later acknowledges that the phrase "to the extent possible" is "unclear, leaving room for differing interpretations about that measure Defendants were obligated to take." In turn, she argues there were at least questions of material fact as to this aspect of her claim.

¶ 40　　　Insofar as she alleges that defendants' conduct breached the promise to treat her with "dignity and respect," she argues that this language was "inherently subjective and open to multiple interpretations," rendering it ambiguous. She argues that such ambiguity means there was an issue of fact that precluded summary judgment.

¶ 41　　　"The elements of a breach of contract claim are (1) the existence of a valid and enforceable contract, (2) performance by the plaintiff, (3) breach of contract by defendant, and (4) resultant injury to the plaintiff." *Zahdan v. Frontline Business Enterprise, Inc.*, 2024 IL App (1st) 221351, ¶ 31.

¶ 42　　　Whether a breach of contract occurred is a question of fact. *Id*. However, "the construction of a contract is an issue of law to be determined by the court" and is reviewed *de novo*. *Wolff v. Bethany North Suburban Group*, 2021 IL App (1st) 191858, ¶ 36. "Contract construction and interpretation are generally well suited to disposition by summary judgment. [Citations.] When, however, the language of a contract is ambiguous, its meaning must be ascertained through a consideration of extrinsic evidence and summary judgment is, therefore,

inappropriate." *William Blair and Co., LLC v. FI Liquidation Corp.*, 358 Ill. App. 3d 324, 334 (2005). "A contract term is ambiguous if it can reasonably be interpreted in more than one way * * * *[Citation.] A contract is not ambiguous, however, if a court can ascertain its meaning from the general contract language." *Id.* at 335. Further, "a court must construe the words of a contract within the context of the contract as a whole." *Id.* (citing *Board of Trade v. Dow Jones & Co.*, 98 Ill. 2d 109, 122-123 (1983)).

¶ 43    We note that, under Illinois law, an employee handbook may constitute an enforceable contract if the traditional requirements of offer, acceptance, and consideration are present. See *Doyle v Holy Cross Hospital,* 289 Ill. App. 3d 75, 78 (1997) (citing *Duldulao v. St. Mary of Nazareth Hospital Center*, 115 Ill. 2d 482, 490 (1987). In this appeal, defendants do not dispute that the handbook was part of a valid contract with Henry.

¶ 44            Henry Cannot Show That Defendants Breached The Handbook's Policies

               Regarding Confidentiality of Complaints and Investigations

¶ 45    We first examine whether an issue of fact precluded summary judgment, insofar as Henry's breach of contract claim was premised on defendants' failure to comply with the handbook's policies regarding the confidentiality of complaints and investigations.

¶ 46    The handbook stated, under the heading "ALL COMPLAINTS WILL BE INVESTIGATED":

>           "Any complaints will be thoroughly, objectively, and
>           confidentially investigated. * * * All complaints will be kept
>           confidential to the extent possible, but confidentiality cannot be
>           guaranteed. If any wrongdoing is found to have occurred,
>           appropriate corrective action, up to and including separation will

be taken against the wrongdoer and acts of further discrimination prevented."

¶ 47 We do not find a sustainable breach of contract claim premised on these provisions for two reasons. First, there is no allegation or evidence that the investigation itself was not kept confidential. The only pertinent allegation is that after Santana's company-wide email disseminated a demand for Henry's termination, Wilson responded by stating that Henry would be investigated for "any inappropriate bias or racism." That is, Henry makes no allegation that the contents or substance of the investigation was disclosed. We agree with defendants that Wilson's email did not breach the handbook's confidentiality provisions, as the handbook did not promise that "the fact of an investigation, *i.e.*, that an investigation would be conducted" would be kept confidential. Moreover, we note that the handbook clearly stated defendants' policy was to investigate "any" complaints. Wilson's email thus publicly acknowledged that defendants would comply with that obligation with respect to the complaint about Henry, that Santana had already made public. Wilson's response thus aligned with the handbook's requirement to investigate, without violating the confidentiality of the substance of investigation.

¶ 48 Separately, we do not find that any triable breach of contract claim can be premised on the handbook's statement that "[a]ll complaints will be kept confidential to the extent possible, but confidentiality cannot be guaranteed." There are two reasons for this conclusion. First, this statement is directed to confidentiality of *complaints*, not investigations. Here, there is no dispute that the complaint naming Henry was made public by Santana's email. There is no allegation or evidence that defendants had anything to do with Santana's decision to widely circulate a document calling for Henry's termination.

¶ 49　　　　In addition, the handbook merely states that complaints will be kept confidential "to the extent possible" but makes no guarantee. This phrase makes the promise too uncertain or indefinite to serve as the basis for a breach of contract. "To be enforceable, the material terms of a contract must also be definite and certain." *Babbitt Municipalities, Inc. v. Health Care Service Corp.*, 2016 IL App (1st) 152662, ¶ 29. "If the contract terms are too uncertain or indefinite to enforce, allegations of a breach of those terms will not provide a basis for a breach of contract claim." *Id.* ¶ 30. Henry has not identified any case suggesting that a promise to do something "to the extent possible," while disclaiming any guarantee of performance, is sufficiently firm and definite to support a breach of contract claim. We thus find no breach can be premised on this sentence of the handbook.

¶ 50　　　　We note that although the trial court did not discuss each of these points, we may still rely on them to affirm. See *Harlin v. Sears Roebuck and Co.*, 369 Ill. App. 3d 27, 31 (2006) (this court may affirm a trial court's grant of summary judgment on any basis appearing in the record, regardless of whether the trial court relied on that basis). In short, we conclude there is no triable issue of fact as to whether defendants breached the provisions of the handbook relating to the confidentiality of complaints and investigations.

¶ 51　　　　　　　The Handbook's "Dignity and Respect" Statement Is Too Vague to Support a

Breach of Contract

¶ 52　　　　We reach the same conclusion, insofar as Henry bases her breach of contract claim on the failure to treat her with "dignity and respect." Reviewing the pertinent phrase of the contract, we find it is too vague and indefinite to form an enforceable promise. Moreover, even *arguendo* that the "dignity and respect" statement was enforceable, its context in the handbook makes clear that

it pertains to defendants' promise not to engage in unlawful employment discrimination, which Henry has not alleged.

¶ 53      The "dignity and respect" language at issue appears in the handbook under the heading "ACE HOTEL IS AN EQUAL EMPLOYMENT OPPORTUNITY EMPLOYER." That portion proceeds to state:

> "Ace Hotel hires people based solely upon their qualifications, and in doing so, complies with all legal requirements. This policy prohibits any employee decision from being made (or not made) based upon any protected classification under local, state, or federal law.

> *Ace Hotel treats every employee with dignity and respect.* Ace Hotel strictly prohibits unlawful discrimination based on race, color, creed, gender, gender identity or expression \*\*\* or any other consideration made unlawful by federal, state or local laws. All such discrimination is unlawful." (Emphasis added).

¶ 54      We fail to see how a breach of contract can be premised on the "dignity and respect" statement. The operative phrase is too vague and indefinite to constitute a contract term that can support a breach of contract count. See *Babbitt Municipalities, Inc*., 2016 IL App (1st) 152662, ¶ 30 ("If the contract terms are too uncertain or indefinite to enforce, allegations of a breach of those terms will not provide a basis for a beach of contract claim.").

¶ 55      As Henry's briefing acknowledges, the meaning of "dignity and respect" is unclear and subjective. Our court has found that such vague expressions of goodwill are not actionable to support a claim for breach of contract. See *Schact v. Galvin*, 2015 IL App (1st) 133427-U, ¶ 31

(agreeing that "alleged breach of terms involving expression of good faith, such as participating with honesty, cooperation, integrity and professionalism are not enforceable" and that the bulk of the allegations "concern such amorphous undertakings that are too indefinite to support a cause of action."); *Penzell v. Taylor*, 219 Ill. App. 3d 680, (1991) (finding no viable breach of contract claim based on party's statement that it would use "best efforts, as this phrase "is too indefinite and uncertain to be an enforceable standard."); see also *Hill v. DePaul University*, 2024 IL App (1st) 221568-U, ¶¶ 22-23 (statements in faculty handbook about university's commitment to "academic freedom" did not set forth enforceable obligations, as they "provide[d] aspirational guidance, not clear, enforceable terms of employment.").

¶ 56    We find that the handbook's statement that employees will be treated with "dignity and respect" is likewise so amorphous that it cannot independently support a breach of contract claim. Indeed, Henry's briefing alludes to this problem, admitting that "the phrase 'dignity and respect' is inherently subjective and open to multiple interpretations." For this reason, we affirm the dismissal of the breach of contract claim, insofar as it was premised on the handbook's statement that employees would be treated with "dignity and respect."

¶ 57    We also note that, even assuming the handbook "dignity and respect" statement was not too indefinite to be the basis of a breach of contract claim, we would independently find that Henry cannot demonstrate that it was breached by the alleged conduct in this case. This is because its context in the handbook shows that it relates to defendants' anti-discrimination policy. "A contract must be construed as a whole, viewing each provision in light of the other provisions. *The parties' intent is not determined by viewing a clause or provision in isolation*, or in looking at detached portions of the contract." (Emphasis added). *Thompson v. Gordon*, 241 Ill. 2d 428, 440 (2011).

¶ 58    The "dignity and respect" statement at issue appears under the heading "ACE HOTEL IS AN EQUAL OPPORTUNITY EMPLOYER." The "dignity and respect" phrase is immediately preceded by language prohibiting employment decisions from being made "upon any protected classification under local, state or federal law." And the "dignity and respect" statement is immediately followed by the language: "Ace Hotel strictly prohibits unlawful discrimination based on race, color, creed, gender **** or any other consideration made unlawful by federal, state or local laws." In this context, it is plain that the handbook's reference to "dignity and respect" is simply meant to reinforce defendants' stated commitment against unlawful discrimination on the basis of race, gender, or other legally protected classifications. Henry has made no allegation that she was the victim of such unlawful discrimination. Thus, even if the "dignity and respect" statement was not too vague to support a breach of contract claim, we would nevertheless find that Henry raised no triable issue of fact for a claim based on that particular language.

¶ 59    For these reasons, we affirm the grant of summary judgment dismissing Henry's breach of contract count.

¶ 60              The Trial Court Properly Granted Summary Judgment on the IIED Count

¶ 61    We turn to address the dismissal of Henry's claim for intentional infliction of emotional distress. To sustain such a claim, a plaintiff must prove: "(1) the defendant's conduct was extreme and outrageous, (2) the defendant intended his conduct to cause severe emotional distress or knew that there was a high probability that his conduct would cause severe emotional distress, and (3) the defendant's conduct did, in fact cause severe emotional distress to the plaintiff." *DiPietro v. GATX Corp.*, 2020 IL App (1st) 192196, ¶ 50.

¶ 62        We recognize that defendants' actions may very well have been distressing to Henry, and we do not mean to condone them. However, even construing the record in the light most favorable to Henry, we do not find evidence supporting the first two elements of an IIED claim. We cannot say the defendants engaged in "extreme and outrageous conduct." Nor can we find evidence of the requisite intent on the part of defendants.

¶ 63        As to the first element, "To be considered extreme and outrageous, the defendant's conduct must go beyond mere insults, indignities, threats, annoyances, petty oppression, or other trivialities." *DiPietro*, 2020 IL App (1st) 192196, ¶ 50. Conduct is extreme and outrageous only where it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Schweihs v. Chase Home Finance*, 2016 IL 120041, ¶ 51 (quoting Restatement (Second) of Torts § cmt. D., at 73 (1965)).  That is, extreme and outrageous conduct is "such that a reasonable person would hear the facts and be compelled to feelings of resentment and outrage." *Duffy v. Orlan Brooks Condominium Ass'n*, 2012 IL App (1st) 113577, ¶ 36.

¶ 64        Significantly, "courts are often hesitant to find a claim for intentional infliction of emotional distress in employment situations because '[c]ourts are concerned that, if everyday job stresses resulting from discipline, personality conflicts, job transfers or even terminations could give rise to a cause of action for intentional infliction of emotional distress, nearly every employee would have a cause of action." *DiPietro*, 2020 IL App (1st) 192196, ¶ 52 (quoting *Graham v. Commonwealth Edison Co.*, 318 Ill. App. 3d 736, 746 (2000)). "[B]ecause employers must often take actions in the course of business that cause emotional distress, liability for a claim of [IIED] in the employment context will only be found where the conduct is truly egregious." *Id.* (citing *Ulm v. Memorial Medical Center*, 2012 IL App (4th) 110421, ¶ 41).

¶ 65    "The determination of whether a defendant's conduct is extreme and outrageous depends upon the particular facts of a case and presents a question of law." *DiPietro*, 2020 IL App (1st) 192196, ¶ 53.

¶ 66    On the record before us, we do not find that Henry can prove the first element, as there is no evidence that defendants engaged in "extreme and outrageous" conduct. In reaching this conclusion, we find it significant that defendants did not initiate any discussion of Henry among her peers, nor did they actually accuse Henry of any wrongdoing. Rather, it was Santana who circulated an email to hundreds of recipients attaching a list of demands, including a call for Henry's termination. In response, Wilson sent an email addressing each demand, including a statement that Henry would be investigated. Although it may have been unpleasant for Henry, we cannot say that this response was outrageous under the circumstances.

¶ 67    We note that in his deposition, Wilson testified that he consulted with several people, including legal counsel, before sending his response to Santana's demands. He testified that defendants felt "as part of the response, we should specifically respond to the demands that were listed in the documents" circulated by Santana. Asked why he named Henry, he testified: "We were directly responding to specific demands that named these people, and that was the only point at which names were used." He noted that the response did not suggest that Henry had done anything improper. He explained: "We are responding to a specific demand that Claire Henry be terminated by saying we would investigate her." Wilson's testimony—which is not directly contradicted—undermines any suggestion that defendants' conduct reached the threshold of outrageous conduct to support an IIED claim.

¶ 68    We acknowledge that, viewing the record in the light most favorable to Henry, the decision to name her in Wilson's email response could be seen as careless or insensitive.

However, we do not find it egregious or outrageous. We keep in mind that even dishonest or wrongful conduct does not necessarily cross the line into the outrageousness to support an IIED claim, especially in the employment context. See, e.g. *Younge v. Cushman & Wakefield, Inc*., 2024 IL App (1st) 221524-U, ¶115 (although "wrongful," defendants' alleged inclusion of false information in plaintiff's performance improvement plan to hasten his departure from the company did not rise to the level of outrageousness to support an IIED claim); *DiPietro*, 2020 IL App (1st) 192196, ¶ 58 (allegations that plaintiff's manager fabricated plaintiff's performance deficiencies before firing her, even if true, did not "cross the line into 'extreme and outrageous,' 'outside all bounds of decency,' or 'truly egregious.' "). Wilson's response said nothing about Henry, other than that an investigation would be conducted. As defendants point out, this is consistent with the statement in the employee handbook that all complaints are investigated. Keeping in mind that defendants' conduct must go beyond "insults" or "indignities" to support a claim for IIED, (*Duffy*, 2012 IL App (1st) 113577, ¶ 36), we do not find that Wilson's email response met this threshold.

¶ 69        We also cannot say that it was extreme or outrageous for defendants to decline to publicly reveal that the independent investigation found no wrongdoing. Henry does not cite anything in the record or any case law suggesting that defendants were obligated to release the results of the investigation, even if she requested that they do so. Indeed, insofar as the handbook stated that all complaints would be "confidentially investigated," it indicated that investigation results would remain confidential. Nothing in the handbook (or anything else in the record) suggests that an investigated employee has a right to request an announcement of the investigation's results in order to clear her name. Thus, although it was understandable for Henry to desire a company-wide announcement of the investigation results in her favor, we cannot say

that the defendants' failure to do so meets the high threshold for outrageous conduct for an IIED claim.

¶ 70    For similar reasons, even viewing the record in the light most favorable to Henry, we do not find sufficient evidence that defendants had the requisite intent to support the second element of an IIED claim. See *Duffy*, 2012 IL App (1st) 113577, ¶ 36 (a plaintiff must establish that the defendant "intended or recklessly disregarded the probability that the conduct would cause the plaintiff to suffer emotional distress"). There is no evidence of such recklessness or intent in the decision to include Henry's name in the response to Santana's petition and associated demands. Rather, Wilson testified that the defendants deemed it necessary to name Henry in their response to Santana's email only because Henry had already been specifically named in Santana's demands. There is no evidence suggesting defendants were motivated by anything other than a desire to quickly and fully respond to each of the serious allegations of racial bias that had been circulated by Santana's email. Although one might view defendants' decision to repeat Henry's name as careless, there is no evidence that they acted with recklessness or an intent to harm her.

¶ 71    Similarly, we find no evidence of such intent, insofar as Henry alleges that defendants refused to announce that the investigation cleared her of any wrongdoing. On this point, we note Wilson's testimony that he did not believe that critics of the hotel would accept the findings of the investigation, and defendants' concern that referencing it would result in a "second round of deeper attacks" on Henry and others. While reasonable people might disagree as to the wisdom of that decision, the evidence indicates that defendants simply did not want to draw further attention to the allegations of racism that had been raised. Although we recognize that this decision may have caused Henry some distress, we see no evidence from which a jury could

infer that defendants acted with the requisite intent or reckless disregard sufficient to support an IIED claim.

¶ 72 We thus find insufficient evidence to support the first two elements of Henry's IIED claim, which compels us to affirm the entry of summary judgment with respect to that count. In turn, we need not discuss whether there was sufficient evidence to raise a question of material fact as to the remaining element of an IIED claim, whether Henry actually endured "severe" emotional distress caused by defendants' conduct. See *DiPietro*, 2020 IL App (1st) 192196, ¶ 50.

¶ 73 CONCLUSION

¶ 74 For the foregoing reasons, we affirm the circuit court's entry of summary judgment in defendants' favor, with respect to both Henry's breach of contract claim as well as the IIED claim.

¶ 75 Affirmed.