2020 IL App (1st) 192196
No. 1-19-2196

SECOND DIVISION
October 27, 2020

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| RITA DIPIETRO, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 17 L 10646 |
| | ) | |
| GATX CORPORATION and LUCY | ) | |
| SANTORSOLA, | ) | The Honorable |
| | ) | Thomas Mulroy, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment and
opinion.

**OPINION**

¶ 1 Plaintiff, Rita DiPietro, appeals from the trial court's grant of summary judgment on her

claims of retaliatory discharge and intentional infliction of emotional distress. For the reasons

that follow, we affirm.

¶ 2 I. BACKGROUND

¶ 3 A. Plaintiff's Second Amended Complaint

¶ 4 In her second amended complaint, plaintiff alleged that in July 2016, she began her

employment as a customer service representative with defendant GATX Corporation ("GATX").

Defendant Lucy Santorsola was plaintiff's manager. During her employment with GATX, plaintiff sometimes took sick leave to care for her mother. These periods of leave usually were for less than three hours. Santorsola directed plaintiff to record her leave in the "Commercial Out of Office" program ("COO Program"). Because the COO Program only accepted time recorded in half-day increments, when plaintiff would take leave of three hours or less, the COO Program would reflect that she had taken four hours of leave. Nevertheless, Santorsola insisted that plaintiff use the COO Program to track her leave. Plaintiff alleged that the COO Program's overstatement of the amount of leave she had taken illegally limited her right to leave in the future.

¶ 5        In February 2017, Santorsola gave plaintiff her first and only performance review. According to plaintiff, her work was rated as "solid achievement," and she was given an above-average performance bonus.

¶ 6        Although plaintiff questioned the use of the COO Program to track leave, Santorsola continued to insist that plaintiff use the COO program to track her leave. As a result, plaintiff's leave continued to be overstated. On May 18, 2017, plaintiff met with Jenny Strable in GATX's human resources department. Plaintiff informed Strable that the use of the COO Program was "cheating" her out of leave time. Strable told plaintiff that the procedure was not appropriate and that she would contact Santorsola. Plaintiff, however, informed Strable that she was concerned that she would face retaliation if Santorsola was contacted because Santorsola had repeatedly warned plaintiff that all issues should be addressed with Santorsola and that human resources and Santorsola's manger should not be contacted. Nevertheless, Santorsola was informed of plaintiff's complaint to Strable.

¶ 7       On the same day that plaintiff met with Strable, plaintiff also met with Harriet McSweeney, Santorsola's manager. Plaintiff told McSweeney that Santorsola was requiring her to track her leave through the COO Program, which resulted in the leave taken being overstated.

¶ 8       On May 30, 2017, Santorsola returned from vacation. McSweeney informed her that, under the Employee Sick Leave Act (Act) (820 ILCS 191/1 *et seq.* (West 2018)), plaintiff should not be required to track her leave. By so informing Santorsola, McSweeney made Santorsola aware that plaintiff had complained to McSweeney.

¶ 9       Thereafter, Santorsola began contacting plaintiff's coworkers to question them about plaintiff, seeking negative information that could be used to justify terminating plaintiff. On June 26, 2017, Santorsola terminated plaintiff's employment in retaliation for complaining to human resources about having to track her leave using the COO Program. In doing so, Santorsola falsely stated that she had discussed plaintiff's performance deficiencies with plaintiff on numerous occasions. No such conversations had ever occurred. In fact, plaintiff had previously received praise from Santorsola, management, customers, and coworkers throughout her employment. During plaintiff's employment, GATX had a procedure that allowed employees to improve their performance in situations where deficiencies are found by their managers. Despite having used this procedure for other employees, Santorsola did not put plaintiff through this process because there was no deficient performance to correct and because Santorsola was determined to terminate plaintiff in retaliation for complaining to human resources.

¶ 10      Following her termination, plaintiff requested a copy of her personnel file from GATX. That file contained handwritten notes by Santorsola that falsely documented counseling sessions between Santorsola and plaintiff and back-dated documents that purported to criticize plaintiff.

The conversations documented by Santorsola in the file never took place and were not included in her performance review.

¶ 11       Plaintiff alleged that her termination violated clearly mandated public policy announced in the Act and the Chicago Minimum Wage and Paid Sick Leave Ordinance (Chicago Municipal Code § 1-24-045 (amended July 1, 2017)). As a result of her termination, plaintiff lost income, including wages, bonuses, and benefits. She also alleged that as a result of Santorsola's intentional, malicious, and willful and wanton conduct, she suffered extreme emotional distress, including shock, sleeplessness, panic, anxiety, loss of appetite, weight loss, humiliation, degradation, loss of confidence, embarrassment, aggravation, frustration, depression, and mental stress.

¶ 12       Based on these allegations, plaintiff brought a claim of retaliatory discharge against GATX and claims of intentional infliction of emotional distress against both GATX and Santorsola. Plaintiff also sought punitive damages on her claims for intentional infliction of emotional distress.

¶ 13                              B. Summary Judgment

¶ 14       Defendants filed a motion for summary judgment on plaintiff's second amended complaint. In that motion, defendants argued that (1) they were entitled to summary judgment on plaintiff's retaliatory discharge claim because plaintiff had not engaged in any protected activity, (2) plaintiff's discharge did not violate public policy, (3) there was no causal link between plaintiff's complaints and her termination, and (4) the proffered reason for plaintiff's termination was not pretextual. With respect to plaintiff's claims for intentional infliction of emotional distress, defendants argued that their alleged conduct was not sufficiently outrageous to support such claims and that plaintiff's claimed emotional distress was not actionable. Finally,

defendants also argued that (1) plaintiff did not have evidence to support an award of punitive damages, (2) the Act did not provide for a private cause of action, and (3) the Chicago Minimum Wage Ordinance was not enacted until after plaintiff was terminated. Plaintiff disputed each of these contentions.

¶ 15 In support of their respective positions, the parties submitted, *inter alia*, the following evidence: excerpts from plaintiff's deposition, excerpts from Santorsola's deposition, a timeline Santorsola created outlining the alleged issues with plaintiff's work performance, excerpts from Holly Allen's deposition, excerpts from Julie Przybyla's deposition, a declaration from McSweeney, plaintiff's February 2017 performance review, excerpts from Strable's deposition, emails forwarded from plaintiff to other GATX employees requesting help or indicating that plaintiff was confused, emails forwarded to plaintiff's personal email account from her work email account, and plaintiff's affidavit.

¶ 16 Santorsola gave the following testimony in her deposition. Santorsola testified that all customer service representatives were required to record their time in the COO Program. In fact, Santorsola was told by her manager, Geri Bowman, that all time out of the office needed to be recorded in the COO Program. Santorsola denied that plaintiff ever complained to her that the COO Program required her to record her time in half-day increments, even when she used less than four hours of leave. Santorsola also denied ever having a conversation with McSweeney or Strable about plaintiff's use of the COO Program to track the sick leave she took to care for her mother. Santorsola testified that she did not learn that plaintiff had complained to Strable until after plaintiff's termination.

¶ 17 At the time that Santorsola started preparing plaintiff's evaluation in December 2016, she already had concerns regarding plaintiff's performance and believed that plaintiff was

"struggling." Nevertheless, she hoped that plaintiff would improve. On the scale used in plaintiff's performance evaluation, "solid achievement" meant average and "mostly solid" was below average. In the first category on the evaluation, "Job Responsibilities," plaintiff received a "mostly solid" rating. In that category, Santorsola noted on the review that plaintiff had shown eagerness to learn her position and that, in the upcoming year, plaintiff needed to work on thoroughly researching customers' issues, summarizing her questions, and following through on directions she had been given. Santorsola testified that these comments represented not only plaintiff's goals for the future, but also an assessment of her past performance. Plaintiff also received a rating of "mostly solid" in the fourth evaluation category, "Support the continued improvement of our NA Maintenance Network—Effective management of the authorization and disposition processes." In the notes on that section, Santorsola wrote that plaintiff needed to work on timely updating her comments while resolving the items on her work list and following up with "MEs, Engineering, Fleet and Sales when cars holding issues are pending feedback or resolution from other departments." In the other four categories of the evaluation, plaintiff received "solid achievement" ratings. Santorsola testified that despite only receiving a below average to average rating on her review, upper management still decided to give plaintiff a pay increase.

¶ 18          Santorsola testified that she would expect a new customer service representative to learn the systems, understand who to contact, and learn how the systems integrated together within three to six months and to really get comfortable within an additional three months.

¶ 19          In June 2017, in preparing for plaintiff's performance check-in, Santorsola reviewed plaintiff's February 2017 evaluation and realized that plaintiff had not shown any improvement despite coaching and training from Santorsola and others throughout the course of plaintiff's

employment. After meeting with McSweeney and the human resources department, the decision was made to terminate plaintiff. Santorsola did not believe that participation in a performance improvement program would be an appropriate course of action because there were too many issues with plaintiff's performance.

¶ 20      That same month, but before plaintiff's termination, Santorsola created a timeline outlining plaintiff's employment with GATX and any concerns raised during that time about plaintiff's performance. Santorsola created the timeline based off of emails, conversations with others, and other documents that she had compiled in a file she kept on plaintiff. This timeline noted a number of issues with plaintiff's performance, starting in mid-August 2016 and continuing through June 2017. These issues included but were not limited to failing to understand and follow company processes, failing to clearly communicate her questions regarding customer emails, disobeying clear directives, involving herself with the customers of other customer service representatives, failing to perform the duties of her position, multiple instances of absences and tardiness unrelated to her mother, making personal phone calls during work hours, attending to personal issues during work hours, exchanging instant messages with a coworker during a team meeting, sending condescending emails to other GATX employees, spending an undue amount of time on tasks that were not her responsibility, and missing deadlines. The timeline also noted that Santorsola discussed many of these issues with plaintiff and even relieved plaintiff of some responsibilities in response to plaintiff's complaints that she was overwhelmed.

¶ 21      Santorsola testified that, in the end, plaintiff was fired for performance-related reasons: she was not performing the basic tasks expected of her position, was not following directions,

was not following the "authorization matrix," and forwarded emails to others with just a question mark rather than summarizing the issue and her question.

¶ 22   In her deposition, plaintiff testified that she worked as a customer service representative with GATX and that she had no managerial or supervisory responsibilities during her employment for GATX.

¶ 23   Plaintiff described the COO Program as a company-wide calendar program through which you could view any employee's availability for a given time. During her orientation at the beginning of her employment with GATX, plaintiff was trained on the use of the COO Program. She identified a document that she was given during that time, entitled "Customer Service Responsibilities and Guidelines." She testified that this document accurately reflected her duties and responsibilities as a customer service representative. She also acknowledged that this document stated that customer service representatives were required to submit out-of-office requests for manager approval though the COO Program and that their calendars must reflect any time they would be out of the office, including visiting a customer, volunteering, or working on an extended project. In addition, plaintiff testified that they were required to track any type of leave they took—vacation or otherwise—using the COO Program. According to plaintiff, although the COO Program overstated the amount of leave she took to care for her mother, at the time of her termination, she still had leave in her bank that she could use to care for her mother. She was never denied leave from GATX to care for her own sickness or to care for her mother.

¶ 24   Plaintiff testified that on May 18, 2017, she met with Strable to discuss the fact that Santorsola was requiring plaintiff to track the leave she took to care for her mother in the COO Program and the fact that the COO Program was overstating the amount of leave actually taken. Strable told plaintiff that she should not have to track her leave in half-day increments if she was

not taking that full amount of time. Strable said she would speak to Santorsola, but plaintiff asked her not to.

¶ 25     During her testimony, plaintiff denied any deficiencies in her work performance and claimed that Santorsola fabricated her claims that she had spoken with plaintiff about the alleged deficiencies. In addition, plaintiff testified that, following her termination, she received a copy of her personnel file, which contained documentation of fabricated meetings at which Santorsola claimed to have had discussions with plaintiff.

¶ 26     Plaintiff acknowledged that she forwarded business related emails from her GATX email account to her personal email account, but testified that she did so to keep a file of accolades she received for her performance.

¶ 27     In her affidavit, plaintiff stated that Santorsola repeatedly told her that it would take between 6 and 12 months to feel comfortable on the job. She denied that during her employment with GATX she struggled with following directions, adhering to company policies, following through with her assigned tasks, or grasping the required tools and systems. She also denied that Santorsola or anyone else told her that her performance was deficient, counseled her in any respect, coached plaintiff unless she asked questions, or took away any of her responsibilities. In fact, she averred that she frequently received praise from upper management in GATX and attached emails representing a portion of those accolades.

¶ 28     Plaintiff went on to offer her explanation of several specific instances identified in Santorsola's timeline. She explained that her forwarding of customer emails to other team members without explicitly stating her question or issue typically only occurred after she had had a conversation about the issue with the receiving team member. In addition, she explained that one of the instances of insubordination cited by Santorsola—where plaintiff brought a laptop to a

sick coworker despite Santorsola's directive not to—was a misunderstanding because plaintiff believed that Santorsola's statement that it was "not necessary" to deliver the laptop simply meant that it should not be done during work hours. She further explained that her statement that she was overwhelmed was the result of the team being short a team member. Finally, she explained that she was instant messaging with her coworker during a team meeting while Santorsola was on the phone with another team member regarding an issue that did not involve plaintiff. She also apologized to Santorsola for the messaging.

¶ 29   Plaintiff additionally averred that on May 18, 2017, she told McSweeney that Santorsola required her to track her leave through the COO Program, which resulted in the amount of leave taken being overstated. Plaintiff stated that she had had at least five conversations with Santorsola in which she complained that the COO Program was overstating her leave because it required her to record her leave in half-day increments. Plaintiff further stated that she told McSweeney about these conversations with Santorsola.

¶ 30   In their depositions, Holly Allen and Julie Przybyla, two of plaintiff's coworkers, corroborated a number of the incidents identified by Santorsola as evidencing performance issues by plaintiff.

¶ 31   McSweeney stated in her declaration that as early as the end of 2016, Santorsola discussed with her concerns regarding plaintiff's performance and that those discussions continued over the next few months. Those concerns included plaintiff's failure to pick up basic tasks and processes, spending significant amounts of time on basic tasks, and generally struggling with the required tasks of her position. McSweeney denied that plaintiff ever complained to her about how the time she took to care for her mother was tracked or about Santorsola as a manager. In June 2017, after Santorsola once again raised her concerns with

plaintiff's performance, McSweeney and Santorsola met with human resources and collectively decided that terminating plaintiff was the appropriate course of action. A performance improvement plan was not indicated because plaintiff had struggled with basic concepts and exhibited insubordination on numerous occasions. After plaintiff's termination, McSweeney learned that plaintiff had forwarded a number of work emails to her personal email address, including business-related emails that contained confidential, sensitive, and proprietary information.

¶ 32     Following a hearing on the matter, the trial court issued its written decision entering summary judgment in favor of defendants. With respect to plaintiff's retaliatory discharge claim, the trial court found that plaintiff's discharge did not violate a clearly stated public policy because plaintiff's complaint related solely to GATX's internal policy that leave be tracked using the COO Program. In contrast, the Act did not mandate that employees be provided with sick leave or that employers track it in a certain way. In addition, the trial court found that the Chicago Minimum Wage Ordinance was irrelevant because it did not go into effect until after plaintiff was terminated.

¶ 33     With respect to plaintiff's claims for intentional infliction of emotional distress, the trial court concluded that defendants were entitled to summary judgment because Santorsola's alleged conduct of requiring plaintiff to track leave using the COO Program, seeking negative information from co-workers, and falsely documenting conversations and counseling sessions with plaintiff to justify plaintiff's termination was not sufficiently extreme and outrageous to support plaintiff's claims.

¶ 34     Plaintiff then instituted this timely appeal.

¶ 35                                    II. ANALYSIS

¶ 36        On appeal, plaintiff argues that the trial court erred in granting summary judgment in favor of defendants because (1) her termination violated the public policy announced in the Act of allowing employees to utilize their sick leave to care for family members and (2) Santorsola's actions of lying about plaintiff's performance, creating false documentation of counseling sessions, and backdating documents were extreme and outrageous in light of her power over plaintiff and the lack of legitimate interest in doing so. We disagree with plaintiff on both counts and affirm.

¶ 37        Summary judgment is to be granted "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2018). Because summary judgment is a drastic measure and should only be granted when the moving party's right to judgment is clear and free from doubt, we must view all evidence in the light most favorable to the nonmovant. *Bourgonje v. Machev*, 362 Ill. App. 3d 984, 994 (2005). We review the trial court's grant of summary judgment *de novo*. *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.*, 223 Ill. 2d 352, 360 (2006).

¶ 38                                A. Retaliatory Discharge

¶ 39        Plaintiff first argues that the trial court erred in granting summary judgment in favor of defendants on her retaliatory discharge claim. Generally, employment for a noncontracted employee in Illinois is at will, meaning that the employer is free to terminate the employee for any or no reason at all. *Turner v. Memorial Medical Center*, 233 Ill. 2d 494, 500 (2009). A claim for retaliatory discharge, however, provides a narrow and limited exception to this general rule where an employee can establish that (1) he or she was discharged by the employer, (2) in

retaliation for his or her activities, and (3) the discharge violates clearly mandated public policy. *Id.*

¶ 40        The trial court based its grant of summary judgment in favor of defendants on plaintiff's retaliatory discharge claim on its conclusion that plaintiff's discharge did not violate clearly mandated public policy. What constitutes "clearly mandated public policy" has been described as follows:

> "There is no precise definition of the term. In general, it can be said that public policy concerns what is right and just and what affects the citizens of the State collectively. It is to be found in the State's constitution and statutes and, when they are silent, in its judicial decisions. [Citation.] Although there is no precise line of demarcation dividing matters that are the subject of public policies from matters purely personal, a survey of cases in other States involving retaliatory discharges shows that a matter must strike at the heart of a citizen's social rights, duties, and responsibilities before the tort will be allowed." *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 130 (1981).

Policies affecting the health and safety of citizens are sufficient to support a retaliatory discharge claim, while policies affecting social and economic regulations are less likely to do so. *Leweling v. Schnadig Corp.*, 276 Ill. App. 3d 890, 894 (1995). "It is widely recognized that the existence of a public policy, as well as the issue whether that policy is undermined by the employee's discharge, presents questions of law for the court to resolve." *Turner*, 233 Ill. 2d at 501.

¶ 41        To justify making an exception to the general rule of at-will employment, the public policy must be clearly mandated and not simply a broad, general statement of policy. *Id.* at 502. "[T]he mere citation of a constitutional or statutory provision in a complaint will not, by itself, be

sufficient to state a cause of action for retaliatory discharge. Rather, an employee must show that the discharge violated the public policy that the cited provision clearly mandates." *Id.* at 505. Accordingly, unless a plaintiff identifies a specific expression of public policy that the employer has violated, the employer may terminate the plaintiff's employment with or without cause. *Id.* at 503, 505.

¶ 42    Here, plaintiff claims that defendants violated public policy in the Act by requiring her to track her sick leave, which she used to care for her ailing mother, in the COO Program. The Act requires that where an employer provides an employee with sick leave for absences due to the employee's illness or injury, it must also permit the employee to use that leave for absences due to the illness, injury, or medical appointments of certain of the employee's family members, including parents, on the same terms as the employee is permitted to use the leave for him or herself. 820 ILCS 191/10(a) (West 2018). Section 20 of the Act further provides:

> "An employer shall not deny an employee the right to use personal sick leave benefits in accordance with this Act or discharge, threaten to discharge, demote, suspend, or in any manner discriminate against an employee for using personal sick leave benefits, attempting to exercise the right to use personal sick leave benefits, filing a complaint with the Illinois Department of Labor or alleging a violation of this Act, cooperating in an investigation or prosecution of an alleged violation of this Act, or opposing any policy or practice or act that is prohibited by this Act. Nothing in this Section prohibits an employer from applying the terms and conditions set forth in the employment benefit plan or paid time off policy applicable to personal sick leave benefits." 820 ILCS 191/20 (West 2018).

According to plaintiff, by requiring her to track her sick leave in the COO Program, which requires time be entered in half-day increments, defendants effectively denied her leave because her leave would be prematurely exhausted by the COO Program's overstatement of the amount of leave taken. Plaintiff argues that when she complained about having to use the COO Program, defendants terminated her in retaliation and in violation of the Act. We disagree.

¶ 43     First, we disagree that plaintiff was denied leave in violation of the Act. The Act prohibits employers from denying employees leave in accordance with the terms of the Act. 820 ILCS 191/20 (West 2018). The Act, however, only requires employers to allow employees to utilize their sick leave to care for family members on the same terms that they are permitted to use the sick leave for their own illness (820 ILCS 191/10(a) (West 2018)) and expressly permits employers to apply their leave policies to sick leave taken to care for family members in the same manner that the policies apply to sick leave taken for employees' illnesses (820 ILCS 191/20 (West 2018)). Accordingly, unless plaintiff was denied leave—directly or indirectly through the use of the COO Program—specifically because she was using it to care for her mother, rather than herself, or on terms that were not applied to regular sick leave, plaintiff's claimed denial of leave did not violate the Act.

¶ 44     Plaintiff acknowledges that defendants never denied her the use of her sick leave to attend to her mother (or for any other reason). Instead, she argues that she was effectively denied leave when she was required to track her leave in half-day increments in the COO Program because it would have resulted in the premature exhaustion of her leave. Although it is certainly true that requiring employees to utilize their leave in half-day increments results in the exhaustion of leave faster than if they are permitted to use it in smaller increments, this does not necessarily render the policy a denial of leave that violates the Act. First of all, there is nothing to

suggest that plaintiff was not permitted to take all four hours of the half-day increments she was required to track. In other words, there is no evidence that defendants only allowed customer service representatives, such as plaintiff, to be out of the office for one or two hours but still charged the representatives for four hours off; instead, the record shows that for business purposes, all time off was tracked in the COO Program in four-hour increments, a fact of which employees were informed at the beginning of their employment. We also note that, even under this system, plaintiff still had leave available to her and had not been denied any leave at the time of her termination.

¶ 45   Second, even if requiring leave to be taken or tracked in half-day increments could be said to constitute a denial of leave, such a denial only violates the Act if it is done because the leave is being used to care for a family member or under a policy that applies only to leave taken to care for a family member. This was not the case here. Plaintiff testified in her deposition that during her orientation, she was informed that one of the duties of customer service representatives was to record all time out of the office—whether sick leave for herself, vacation, or customer meetings—in the COO Program. Likewise, Santorsola testified that all customer service representatives were required to use the COO Program to track their time out of the office. In other words, all customer service representatives were required to use the COO Program to track all types of leave; neither plaintiff nor sick leave used to care for family members was singled out for different treatment. Thus, there is nothing in the record that suggests that plaintiff was denied the use of her sick leave to care for her mother or that such leave was treated any differently than any other type of leave, which is exactly the purpose of the Act. Rather, it appears that defendants granted plaintiff use of her sick leave to care for her

mother on the exact same terms as it granted her any other type of leave, which complies with the dictates of the Act.

¶ 46 We also note that there is nothing in the Act that prohibits employers from requiring employees from taking leave in half-day increments or that requires employers to track leave on a minute-by-minute basis. As discussed above, the Act simply requires that employers permit employees to use their sick leave to care for family members on the same terms. Here, as discussed, all leave and other absences were subject to being tracked in the COO Program. Accordingly, the use of the COO Program did not violate the Act in any way.

¶ 47 We also disagree that plaintiff's termination, even if done in retaliation for her complaints about the use of the COO Program, violated the Act. The Act prohibits the termination of an employee for complaining about policies only if the complained-of policy violates the Act. 820 ILCS 191/20 (West 2018). Here, for all the reasons discussed above, defendants' policy that employees take and/or track their leave in half-day increments does not violate the Act. Accordingly, plaintiff's termination did not violate the clearly mandated policy of the Act, and the trial court did not err in concluding that defendants were entitled to summary judgment on plaintiff's retaliatory judgment claim.

¶ 48 B. Intentional Infliction of Emotional Distress

¶ 49 Plaintiff next argues that the trial court erred in concluding that defendants' alleged conduct was not sufficiently extreme and outrageous to support a claim for intentional infliction of emotional distress. In support, plaintiff argues that Santorsola lied about plaintiff's performance, created false documentation of counseling sessions that never occurred, and backdated documents to make it appear they were made contemporaneously with counseling

sessions. Plaintiff argues that these actions were extreme and outrageous in light of Santorsola's power over plaintiff and the lack of legitimate interest in doing so. Again, we disagree.

¶ 50     To sustain a claim for intentional infliction of emotional distress, a plaintiff must prove the following: (1) the defendant's conduct was extreme and outrageous, (2) the defendant intended his conduct to cause severe emotional distress or knew that there was a high probability that his conduct would cause severe emotional distress, and (3) the defendant's conduct did, in fact, cause severe emotional distress to the plaintiff. *Schweihs v. Chase Home Finance, LLC*, 2016 IL 120041, ¶ 50. To be considered extreme and outrageous, the defendant's conduct must go beyond " 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' " *McGrath v. Fahey*, 126 Ill. 2d 78, 86 (1988) (quoting Restatement (Second) of Torts § 46 cmt. d, at 73 (1965)). Nor is it enough that the defendant acted with the intention of causing emotional distress, a tortious or criminal intent, or even malice. *Public Finance Corp. v. Davis*, 66 Ill. 2d 85, 90 (1976). Rather, " '[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Milton v. Illinois Bell Telephone Co.*, 101 Ill. App. 3d 75, 78 (1981) (quoting Restatement (Second) of Torts § 46 cmt. d, at 73 (1965)).

¶ 51     In assessing the extreme and outrageous nature of the defendant's alleged behavior, courts may consider a number of factors, including (1) the degree of power the defendant held over the plaintiff, especially where the alleged conduct includes a threat to use that power to the plaintiff's detriment; (2) whether the defendant reasonably believed that the objective of his or her conduct was legitimate; and (3) the defendant's knowledge that the plaintiff was particularly susceptible to emotional distress. *McGrath*, 126 Ill. 2d at 87-90. This list of factors is not

exhaustive, nor is any one or all of these factors necessary to a claim of intentional infliction of emotional distress. *Id.* at 90.

¶ 52    Although the employer-employee relationship can, in some cases, aggravate the nature of the defendant's conduct, such that it might be considered extreme and outrageous, that is not always the case. *Gibson v. Chemical Card Services Corp.*, 157 Ill. App. 3d 211, 217 (1987). In fact, courts are often hesitant to find a claim for intentional infliction of emotional distress in employment situations because "[c]ourts are concerned that, if everyday job stresses resulting from discipline, personality conflicts, job transfers or even terminations could give rise to a cause of action for intentional infliction of emotional distress, nearly every employee would have a cause of action." *Graham v. Commonwealth Edison Co.*, 318 Ill. App. 3d 736, 746 (2000). Accordingly, because employers must often take actions in the course of business that cause emotional distress, liability for a claim of intentional infliction of emotional distress in the employment context will only be found where the conduct is truly egregious. *Ulm v. Memorial Medical Center*, 2012 IL App (4th) 110421, ¶ 41.

¶ 53    The determination of whether a defendant's conduct is extreme and outrageous depends upon the particular facts of a case and presents a question of law. *Id.* ¶ 39.

¶ 54    Plaintiff argues that the trial court erred in concluding that defendants' actions were not extreme and outrageous. According to plaintiff, in retaliation for plaintiff's complaining about how her sick leave was being tracked, Santorsola lied about plaintiff's performance, fabricated documentation of counseling sessions that never occurred, and backdated a document to make it appear that it was a contemporaneous documentation of counseling session. Plaintiff argues these actions were exacerbated and rendered extreme and outrageous by the facts that defendants were in a position of power over plaintiff and there was no legitimate basis for plaintiff's termination.

¶ 55    In support of her argument, instead of citing directly to admissible evidence, plaintiff points to her response to defendants' list of disputed material facts. In their list of disputed material facts, defendants alleged that plaintiff was deficient in her performance, failed to follow company policies, and failed to follow directions. Defendants also alleged that plaintiff was counseled regarding the issues in her performance. In response to these allegations, consistent with her deposition testimony and affidavit, plaintiff either directly denied these allegations, qualified them in some respect, argued that the alleged deficiencies or discussions were not contemporaneously documented, or claimed that the alleged shortcomings occurred during the 6-to-12-month time period Santorsola told plaintiff it would take to become comfortable in her position. Even crediting plaintiff's denials and qualifications, as we must, this appears to be no more than a situation in which the parties dispute whether plaintiff's performance was deficient and whether plaintiff's termination was justified—a situation that nearly always arises when employees are terminated against their will.

¶ 56    Even taking into consideration defendants' position of power over plaintiff, this alone does not elevate the circumstances surrounding plaintiff's termination to extreme and outrageous, given that all employers have power over their employees. *Gibson*, 157 Ill. App. 3d at 217. We find this to be especially true where, as here, the power was not used to extort or coerce the plaintiff in any manner. *Cf. Graham*, 318 Ill. App. 3d at 747 ("Courts have found outrageous behavior where defendants threatened to exercise their power to coerce plaintiffs into doing something they would not otherwise do."); *Milton*, 101 Ill. App. 3d at 80-81 (employer harassed employee in an attempt to coerce employee to falsify work reports). To put it simply, the termination of an employee by an employer is not extreme and outrageous just because the employee disputes the merits of the termination and the employer holds power over the

employee, since an employee will almost always deny that the termination was warranted and an employer always holds power over an employee. Thus, because such a situation merely represents an everyday situation in employment relationships, it is not truly egregious. *Ulm*, 2012 IL App (4th) 110421, ¶ 41.

¶ 57    Moreover, plaintiff's contention that defendants knew Santorsola's purpose was illegitimate because her actions were taken in retaliation for plaintiff complaining about the use of the COO Program violated her rights under the Act is without merit.  As discussed above, the use of the COO Program to track leave did not violate the Act.

¶ 58    At most, plaintiff's allegations that Santorsola manufactured some of the alleged performance deficiencies on plaintiff's part, lied about reviewing some of those deficiencies with plaintiff, and did not contemporaneously document all of the discussions with plaintiff—even assuming they are true—simply represent ill will between Santorsola and plaintiff (possibly because of plaintiff's complaints) and bad behavior by Santorsola. The alleged conduct does not cross the line into "extreme and outrageous," "outside all bounds of decency," or "truly egregious." After all, given that there is no dispute that plaintiff was anything other than at-will employee, defendants could have fired plaintiff for no reason at all if they had so chosen and were under no obligation to present or document a specific cause for plaintiff's termination. Santorsola's alleged malice in firing plaintiff is not enough to support a conclusion that her behavior was necessarily extreme and outrageous. *Public Finance Corp.*, 66 Ill. 2d at 90.

¶ 59    The cases cited by plaintiff also do not convince us that the trial court erred. In *Graham*, the defendant employer, in retaliation for the plaintiff-employee's reporting of nuclear safety violations, conducted a five-month-long sham investigation into allegations against the employee that the employer knew were false. More specifically, the employer conducted interviews with

100 other employees, during which the employer made false statements that the plaintiff employee falsified documents, planted radioactive material outside the posted area, and was a leader of a gang, among other outrageous statements. When the other employees told the employer that they had no knowledge of any such conduct by the plaintiff employee, the employer repeated the false statements and again asked the other employees to confirm their knowledge of the allegations. The *Graham* court found this to constitute extreme and outrageous behavior. *Graham*, 318 Ill. App. 3d at 748.

¶ 60    Similarly, in *Milton*, the plaintiff employee alleged that in retaliation for his refusal to falsify work reports, his employer gave him undesirable assignments, provided him with less opportunity for overtime, criticized him for complying with the company's rules but then punished him for not following them, set unrealistic time estimates for his assignments, watched him closely and followed him on his jobs, misled customers about his abilities and integrity, encouraged customers to complain about him, denied plaintiff leave, refused to accept accurate work reports from him, and added false information to plaintiff's work reports. *Milton*, 101 Ill. App. 3d at 77-78. The *Milton* court found these allegations to support a conclusion of extreme and outrageous conduct because the employer was leveraging its large corporate power in an attempt to coerce the plaintiff employee to illegally falsify reports that were then used to bill customers. *Id.* at 79-80.

¶ 61    We do not believe that the conduct alleged in this case even comes close to the severity of the conduct alleged in *Graham* and *Milton*. First of all, in *Graham* and *Milton*, the employers were alleged to have been retaliating against the employees for complying with safety and legal requirements, *i.e.*, reporting safety violations and refusing to illegally falsify work reports. Here, at worst, plaintiff was terminated in response to her complaints about defendants' method of

tracking sick leave. Second, the conduct alleged here took place over the course of less than a month, starting at the beginning of June 2017, when Santorsola began her alleged campaign to secure the termination of plaintiff, and ending on June 26, 2017, when plaintiff was terminated. In contrast, the sham investigation alleged in *Graham* lasted five months, while the plaintiff in *Milton* alleged that he endured the alleged harassment through the entire course of his employment. *Graham*, 318 Ill. App. 3d at 748; *Milton*, 101 Ill. App. 3d at 77.

¶ 62 Most importantly, however, the nature of the alleged conduct in *Graham* and *Milton* was much more severe than the conduct alleged here. In *Graham*, the employer published very serious defamatory statements to a large number of plaintiff's coworkers, knowing the statements to be false. In *Milton*, the employer engaged in an extended and repeated practice of harassment across all aspects of the plaintiff's employment. Here, however, plaintiff simply claims that Santorsola fabricated some of the cited reasons for plaintiff's termination. Notably, although plaintiff denies the characterization of her performance as deficient, she does not deny that some of the complained-of incidents occurred. Instead, she attempts to qualify some of them as occurring early in her employment or to minimize the severity or frequency of the issues. Plaintiff also claims that Santorsola lied about speaking with plaintiff about some of these issues, backdated documentation of conversations with plaintiff to make it appear contemporaneous, and did not discuss all of these issues with plaintiff until plaintiff initiated the conversation on the issue. Although we find it to be a poor employment practice to not communicate performance deficiencies with employees and document such communications, we do not find the failure to do so to be so extreme and outrageous that they support a claim of intentional infliction of emotional distress.

¶ 63      Rather, we find plaintiff's allegations to be more analogous to those in *Ulm*. There, the plaintiff-employee alleged that, in retaliation for her refusal to continue to certify medical records in violation of accreditation standards, (1) her supervisor was openly hostile to her, (2) her supervisor discussed plaintiff's performance with other employees and told them that plaintiff would likely be discharged, (3) plaintiff was given negative feedback, (4) she was not offered support, (5) her office was relocated, (6) her secretary was reassigned, (7) she was told her education was useless, (8) she was asked to do work that was previously assigned to lower-level employees, and (9) eventually she was discharged. *Ulm*, 2012 IL App (4th) 110421, ¶ 45. In concluding that the employer's alleged conduct was not extreme and outrageous, the *Ulm* court stated:

> "The prolonged and unexpected deterioration of an employment relationship is understandably stressful for an employee. Nevertheless, considering defendant's role as plaintiff's employer, in which defendant was called upon continuously to evaluate plaintiff's performance and occasionally to make necessarily distressing employment decisions, we conclude defendant's alleged conduct in this case—however unpleasant—did not meet the standard of 'extreme and outrageous' conduct. Whether one could describe defendant's handling of the last several months of plaintiff's employment as displeasing, no conduct alleged of defendant would provoke in an ordinary person the kind of disdainful response that defines extreme and outrageous conduct within the employment relationship. Accordingly, the trial court did not err in granting defendant summary judgment on plaintiff's claim of intentional infliction of emotional distress." *Id.* ¶ 46.

As the *Ulm* court stated, although defendants' alleged conduct here can aptly be described as unpleasant and displeasing, none of it rises to the level of extreme and courageous. In fact, we find the conduct alleged in this case to be less troublesome than the cumulative conduct alleged in *Ulm*.

¶ 64    We note that plaintiff argues that *Ulm* is unpersuasive because, there, the plaintiff was in charge of bringing the defendant employer's record-certifying processes of which she complained into compliance with applicable standards. Although this was a relevant consideration in the *Ulm* court's conclusion that the plaintiff's discharge did not violate public policy for purposes of her retaliatory discharge claim (*id.* ¶ 23), it has no relevance in assessing whether the defendant's alleged harassing conduct was extreme and outrageous for purposes of the plaintiff's claim for intentional infliction of emotional distress.

¶ 65                                III. CONCLUSION

¶ 66    For the foregoing reasons, the judgment of the Circuit Court of Cook County is affirmed.

¶ 67    Affirmed.

---

**No. 1-19-2196**

---

| | |
|---|---|
| **Cite as:** | *Dipietro v. GATX Corp.*, 2020 IL App (1st) 192196 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-L-10646; the Hon. Thomas Mulroy, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Thomas C. Crooks, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Saul Ewing Arnstein & Lehr LLP, of Chicago (Hal R. Morris, John C. Gekas, E. Jason Tremblay, and Elizabeth A. Thompson, of counsel), for appellees. |

---