2023 IL App (1st) 221379-U

SECOND DIVISION
September 26, 2023

No. 1-22-1379

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| STEFEN LIPPITZ, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County |
| | ) | |
| v. | ) | 2019-L-006947 |
| | ) | |
| BORIS PARAD, AS ASSIGNEE OF JACOB BLETNITSKY, | ) | Honorable |
| | ) | Daniel J. Kubasiak, |
| Defendant-Appellant. | ) | Judge Presiding |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Justices Ellis and Cobbs concurred in the judgment.

**O R D E R**

¶ 1   *Held*:   Rejection of counterclaim for breach of contract was affirmed because the manifest weight of the evidence showed that the parties had not entered into a contract.

¶ 2   When Stefen Lippitz sued Jacob Bletnitsky for breach of a $600,000 loan agreement, Bletnitsky counterclaimed that Lippitz actually owed money due to another agreement between the parties that entitled Bletnitsky to 70% of the net profits of Lippitz's video gaming terminal (gambling) enterprise. Bletnitsky's pleading survived Lippitz's motion to dismiss for failure to state a claim, but after a bench trial, the court entered a judgment of $1.1 million on Lippitz's claim and denied Bletnitsky's counterclaim. Bletnitsky then declared bankruptcy and his attorney, Boris

Parad, bought the rights to the counterclaim and now appeals. (The judgment on Lippitz's claim is not at issue.) Parad argues that the denial of the motion to dismiss the contract counterclaim for failure to state a claim (see 735 ILCS 5/2-615 (West 2018)) was a determination that a contract existed and, therefore, the circuit court could not subsequently consider evidence as to whether the contract existed. Parad asks for reversal of the judgment on the counterclaim and an award of nearly $5 million for Lippitz's alleged breach of contract. Lippitz responds that the manifest weight of the evidence supports the circuit court's rejection of the counterclaim.

¶ 3     Lippitz initiated this lawsuit in 2019, seeking damages caused by Bletnitsky's breach of a written promissory note and related loan documents. Lippitz alleged that on June 20, 2012, the parties entered into a written "Loan Agreement," "Promissory Note," and "Memorandum of Understanding," indicating Lippitz would lend Bletnitsky $1 million for 24 months. The loan documents indicated that the funds were for Bletnitsky's additional investment in his company, JAD Gaming, LLC (JAD), which was on the verge of obtaining a license from the Illinois Gaming Board to operate video gaming terminals in Illinois businesses. Lippitz also alleged that he wire-transferred $600,000 to Bletnitsky in accordance with the parties' written terms and that Bletnitsky never requested the additional $400,000. Despite Lippitz's demands to be repaid, Bletnitsky failed to pay principal and interest by the maturity date of June 20, 2014, and under these circumstances, the note also entitled Lippitz to his attorney fees and costs.

¶ 4     In response, Bletnitsky filed an answer and affirmative defenses, and four counterclaims. The counterclaims—breach of contract, unjust enrichment, a need for an accounting, and fraud— were all based on a document entitled "Agreement in Principal" [(*sic*)] (AIP) that the parties signed on August 2, 2012. Bletnitsky alleged that the AIP was his contingency plan in the event that the

gaming board turned down his license application. According to Bletnitsky, the AIP indicated that he and Lippitz would organize a new video terminal operator company called LZ Entertainment, LLC (LZ) that would be owned by Lippitz but operated by Bletnitsky, LZ "would then take over JAD's [gaming equipment installation] agreements," and Lippitz would pay 70% of LZ's "net profits" to Bletnitsky, into perpetuity. The AIP states that Lippitz would share "net profits" with Bletnitsky as a "personal gift" reflecting "the long term friendship of the parties" and Bletnitsky's "advice" and "help" in Lippitz's development and operation of a new gaming company. Bletnitsky claimed that Lippitz breached the AIP by failing to pay the "net profits" and had sold LZ to a third-party without providing written notice or payment to Bletnitsky.

¶ 5     Lippitz filed a section 2-615 motion to strike Bletnitsky's affirmative defenses and a separate section 2-615 motion to dismiss Bletnitsky's counterclaims. The circuit court dismissed three of the four counterclaims, sparing only the one in which Bletnitsky claimed that Lippitz breached the AIP's "net profit" terms. The court stated that Bletnitsky had "minimally satisfied" the section 2-615 standards for alleging a breach of contract. This order is at the center of Parad's appeal. It is the ruling that he argues precluded the circuit court from later hearing evidence as to whether the parties actually entered into a contract.

¶ 6     Bletnitsky next filed an answer and first amended affirmative defenses to Lippitz's complaint and a first amended counterclaim in which Bletnitsky restated the same breach of contract counterclaim and set out an amended counterclaim for fraud. Lippitz answered the first amended counterclaim for breach of contract and included the affirmative defenses of waiver and estoppel. According to Lippitz and not disputed by Parad, although there is a gap in the record tendered for our review, Bletnitsky made two more unsuccessful attempts to state a claim for fraud,

which meant that his only counterclaim that went to trial was the breach of contract count that Bletnitsky based on the AIP (as set out in Bletnitsky's first amended counterclaim). It is undisputed that Bletnitsky did not file a response to Lippitz's affirmative defenses of waiver and estoppel in which Lippitz alleged that not only had Bletnitsky failed to provide any consideration for the AIP and failed to provide any services ("advice" and "help") pursuant to the AIP, but also, Bletnitsky failed to seek compensation pursuant to the AIP. The parties disagree about the significance of Bletnitsky's failure to file a written response to the affirmative defenses.

¶ 7 Lippitz, Bletnitsky, and two former consultants testified at the bench trial. We have considered the full record on appeal, but summarize only the testimony and evidence that is relevant to the disposition of the issues presented by the parties.

¶ 8 Lippitz was the first witness. He testified that Bletnitsky approached him in 2010 about participating in JAD, the company that Bletnitsky had formed to apply for a video gaming license. Lippitz invested $1 million in JAD in exchange for 7.5% of its Class B shares.

¶ 9 In June 2012, while JAD's license application was pending, Bletnitsky said that the gaming board considered some of JAD's investors or other associates to be unsuitable and he asked Lippitz for a loan to buy out their interests. Bletnitsky sent Lippitz the first draft of an agreement on June 7, 2012 and after they negotiated further, Lippitz's attorney wrote the final version of the loan documents that the parties executed on June 20, 2012. They agreed to a $1 million loan to be repaid in two years with 6% interest, reduced to 5% interest if Bletnitsky paid off the loan early. Lippitz had the option to forego cash repayment and take additional shares of JAD. Out of concern that there was no collateral for such a large loan, Lippitz chose to transfer only $600,000 at first, but Bletnitsky never objected to the smaller amount or asked for or received the additional $400,000.

Lippitz wired the $600,000 the same day that they signed the contract. Bletnitsky never repaid any of the loan.

¶ 10     In a letter dated July 27, 2012, the gaming board denied JAD's application, stating, "JAD Gaming, LLC through its employee and Owner, Jacob Bletnitsky, has associated both personally and professionally with persons of notorious and unsavory reputation." Lippitz did not see the denial letter until many years later when he obtained it in connection with his lawsuit. (We note that the paragraph continues, "Furthermore, two individuals who until recently held an ownership interest in JAD *** failed to disclose arrests and have a history of tax delinquencies and credit issues." The paragraph concludes, "Due to this conduct, JAD *** fails to meet the qualifications [for licensing].")

¶ 11     When Lippitz e-mailed Bletnitsky on July 30, 2012, asking for an update, Bletnitsky responded that he was going to meet with his gaming attorney and was very positive about getting the denial reversed on appeal. At the same time, Bletnitsky suggested that if JAD did not get the license, then Lippitz could become an owner/applicant of a new company but still function as just an investor while Bletnitsky operated the business. In early August 2012, Ed Plotkin and Bletnitsky showed up at Lippitz's house for an impromptu meeting. Lippitz had been introduced to Plotkin about a year before. Plotkin had experience in Illinois gaming and was helping JAD with its application. Lippitz was under the impression that Plotkin was an attorney. They had a document for Lippitz's signature. They discussed a "what-if" plan, in case JAD's application did not succeed. Lippitz anticipated that if they ever had to deploy a contingency plan, they would have more discussions and he "would have lawyers" and full documentation like he did when he and Bletnitsky negotiated and later executed the $600,000 loan documents. Lippitz was a practicing

orthodontist who knew "very little" at the time about the gaming industry—only as much as most people who read the newspaper. The document that Plotkin brought to Lippitz's house was the AIP which misspelled "principle" and Lippitz's first name in two places, indicated Lippitz and Bletnitsky had a long-term friendship when they were really just friendly acquaintances, and stated that Bletnitsky would provide "advice" and "help" in connection with the development and operation of a newly-formed video terminal operating company, even though no one discussed what those terms would actually mean. The contingency plan of forming another company never came to fruition and there never was a company that Lippitz owned and Bletnitsky operated.

¶ 12    Years went by and Bletnitsky never asked whether LZ was profitable or claim to be owed any money under the AIP until spring of 2019, in response to Lippitz's request for repayment of the $600,000 loan. Lippitz had been asking Bletnitsky every year for repayment. When Lippitz contacted Bletnitsky in 2014 after the loan matured, Bletnitsky said he did not have the funds and that a collection suit would jeopardize a job that he was trying to get in a South Loop building that would enable him to pay the debt. After Bletnitsky was hired by the building, he reiterated his intention to pay his debt, but said he was out of town and that they could talk when he came back. Lippitz repeated the payment demand every summer, and in 2015, 2016, 2017, and 2018, Bletnitsky affirmed the debt and said that he just needed more time.

¶ 13    When Lippitz formed LZ in 2012, he knew little about the gaming industry. LZ hired Plotkin and Plotkin's company ESP Services at the rate of $7000 per month to fill out LZ's license application and oversee commissioned sales agents who solicited liquor license holders to commit to using LZ as their gaming company. Lippitz used his own money, not JAD's money to fund LZ. During the "Plotkin period," LZ did not own any gaming equipment or ATM machines to install

in the gaming locations or rent any storage space.

¶ 14     Lippitz's video gaming operator license was granted on May 23, 2013. On October 25, 2013, the gaming board told him that Plotkin was unsuitable and that Lippitz would have to disassociate from Plotkin no later than November 1, 2013. Lippitz ended the relationship in October and then connected with Pat Ostry and Tom Minard, both of whom had experience in the Illinois gaming industry. LZ's next step was to determine the value of the contracts that Lippitz had acquired from JAD. When JAD's application had been denied, JAD's investors were supposed to receive 95% of their money back, although this was reduced to 70%. Lippitz had invested $1 million in JAD, but instead of getting back $700,000, he had agreed to take $300,000 cash and all of JAD's use agreements, which Plotkin and Bletnitsky had said were worth $400,000. The placement agreements proved to be worth far less than that when Accel Entertainment Gaming, LLC (Accel) evaluated the whole roster and expressed interest in only 33 of them, for a total price of $16,500. Accel also entered into revenue sharing agreements on those contracts, but none of them ever produced income.

¶ 15     After selling the contracts to Accel, LZ was at "ground zero," having only a video gaming license and no assets. In 2014, Lippitz, still using his own funds, hired Chad Michael, who was working for Accel at the time and had experience building gaming companies. Minard and Michael then began building LZ's business by acquiring video gaming "routes" from third parties such as Tangent Gaming, video gaming equipment, and warehouse space. A "route" is when a video terminal operator has active use agreements with multiple establishments that are licensed by the gaming board and has gaming machines in place that are generating revenue. A terminal operator supplies and services the gaming equipment; maintains the ATM from which winners are paid;

collects, counts and deposits revenue at the bank; and files reports with the gaming board.

¶ 16    Over the course of 2014 through 2017, LZ became a functioning video gaming terminal operator due to the efforts of Lippitz, Ostry, Minard, and Michael, and by Lippitz investing his own funds and not taking a salary. In 2017, a gaming company called Tap Room Gaming approached Lippitz and agreed to buy LZ's assets. During the 2012 through 2013 time frame when Plotkin was providing consulting services (and being paid consulting fees), Bletnitsky did not provide any assistance to Lippitz or LZ. From 2014 onward, after LZ disassociated with Plotkin, Bletnitsky did not provide any advice, help, or assistance to Lippitz or LZ.

¶ 17    On cross-examination Lippitz acknowledged that there was no stated reason for his $600,000 wire transfer to Bletnitsky, no loan documents for $600,000, and no documents or e-mails connecting the $1 million loan documents to the $600,000 wire transfer.

¶ 18    Bletnitsky was the second witness. He owned a dental lab for over 30 years and was a real estate developer. JAD was his first experience with the gaming industry. He became one of JAD's four Class A investors, but most of the capital came from the Class B investors, including Lippitz who invested half of the $2 million that was raised from that class. He denied that the $600,000 wire transfer that he received in 2012 was related to the loan documents at issue. In June 2012, his attorney said that the gaming board might not issue a license to JAD unless two of the four Class A investors surrendered their shares. He needed $25,000 to buy them out. He thought there was a spending limit on JAD's funds before JAD was licensed, so he borrowed $600,000 from Lippitz. After getting the wire transfer, he never asked Lippitz for an additional $400,000, because the "600 had nothing to do with [the] original million dollar loan."

¶ 19    Bletnitsky did not share the gaming board's denial letter with Lippitz because Lippitz (JAD's primary investor) did not ask for it. But (pursuant to the AIP), Bletnitsky gave "help" and "advice" with LZ whenever Lippitz called him, which was "numerous times." He and Lippitz had a verbal understanding, which Plotkin witnessed, that the "net profits" that Bletnitsky was entitled to receive pursuant to the AIP would offset his $600,000 loan debt to Lippitz. Lippitz told him in 2014 that LZ was losing money (it did not have "net profits"). This testimony was impeached by his deposition answers that he did not know in 2014, 2015, 2016, or 2017 whether LZ was generating any revenue. He authorized Parad to send a payment demand letter to Lippitz in June of 2019, and did not make a written demand prior to that because it would have caused LZ to lose its license. Around the end of 2013, he stopped providing any advice or services to LZ because Lippitz called him and said, " 'sorry, Jacob, we have to move forward without you.' "

¶ 20    Under questioning by his attorney, Bletnitsky testified that he and Lippitz negotiated the AIP over the course of several days and then Lippitz came to Bletnitsky's office to sign it. Lippitz asked that Bletnitsky not put any advice and counsel about LZ into writing so that they did not jeopardize LZ's licensure. Bletnitsky was free to do this because the gaming board had already denied JAD's license and he was not subject to its jurisdiction. JAD's use agreements were very valuable because there was a finite pool of potential locations for gaming terminals. He knew of some agreements being sold for $50,000. Without Bletnitsky, LZ would not have its name or the business foundation of having close to a hundred location contracts. After he sold the contracts to LZ, he became its advisor and consultant and had to "give a lot of help" because most of the establishments' owners were unwilling to work with LZ. When Lippitz would call for help, Bletnitsky would have to take the time to physically go to those establishments, buy drinks, and

use his personal relationships with the owners "to convince them to transfer the contracts to LZ." There were a lot of competitors who also wanted those locations. Bletnitsky wanted to be compensated because it had taken him more than two years and hundreds of thousands of dollars to develop the locations, and he had given his two best sales agents to LZ. Those sales agents had been trained "how to talk" and given a template that was also given to LZ. So when LZ started, its foundation was already there. Lippitz called Bletnitsky numerous times to get "strategic advice" about LZ's budgeting, marketing, and commission payment, while Plotkin was doing LZ's day-to-day tasks. Bletnitsky never refused to answer any of Lippitz's questions or denied advice or counsel.

¶ 21    Before the AIP was signed in August 2012, Bletnitsky and Plotkin, Lippitz, and Lippitz's attorney and accountant discussed the terms, and then the attorney and accountant gave their approval. But a few days after the AIP was signed in 2012 or in 2014 (the date was unclear from the testimony), the attorney tried to renegotiate Lippitz's 30% to 40% or even 50%, but backed down to the original agreement.

¶ 22    When Lippitz first asked for repayment of the $600,000 in 2014, Bletnitsky said that he was owed LZ's net profits, Lippitz replied that LZ was not profitable. Bletnitsky said they could wait until LZ became profitable or was sold. After that, they would talk about once a year, and Lippitz would always say that LZ was not profitable. Bletnitsky asked Plotkin to look at LZ's revenue information on the gaming board's website. They could see that LZ's revenue was increasing but they did not know the extent of LZ's expenses and could not determine whether LZ was profitable.

¶ 23    On cross-examination by Lippitz's attorney, Bletnitsky acknowledged that although he was contending that the AIP was about the transfer of JAD's agreements, the AIP did not refer to any agreement, and that the AIP was between two individuals and did not include JAD, the party that had contracted with the establishments. Lippitz called Bletnitsky for advice and counsel almost every day.

¶ 24    Edwin Plotkin testified that he attended two years of law school, did not graduate, and was never licensed as an attorney or other professional. Through his company, Bell Vending, Plotkin leased jukeboxes, pool tables, and amusement games to bars and other businesses. Before gaming was legalized in Illinois, he placed "gray machines" in establishments and would split the revenue. There were no written contracts and no payments to the state. Through his other company, ESP Services, he was a consultant for gaming companies including JAD, and assisted with their applications, signed up potential establishments, trained sales agents, acquired gaming machines, created operating agreements, and provided cost estimates for operating budgets.

¶ 25    JAD became Plotkin's largest client. After JAD's first appeal was denied, Bletnitsky pursued a further appeal in September 2012 with the state. Plotkin drafted the AIP, writing terms that had been negotiated only between Bletnitsky and Lippitz, and Plotkin did not give the draft to anyone to review besides Bletnitsky and Lippitz. The document was signed in one of their offices but Plotkin could not recall which one. The intention was for Bletnitsky to receive 70% of the net profits of his former business. They knew at that point that JAD's license had been denied. Plotkin included the phrase "personal sharing" in the AIP to indicate that the money was coming from Lippitz personally, not from LZ, out concern for the gaming board. He drafted the AIP rather than attorney Friedman as "a precaution" so there would be no apparent connection to the gaming board

between Bletnitsky, LZ, and Lippitz. Plotkin acknowledged that the AIP, executed on August 12, 2012, made no mention of the loan documents that Lippitz and Bletnitsky executed on June 20, 2012, and did not purport to supersede those documents. Plotkin was not aware of any documents indicating Lippitz forgave the $600,000 loan to Bletnitsky. Plotkin considered the debt to be "a personal note between Jacob and Stefen" that was separate from JAD's redemption of Lippitz's investment. LZ paid his consulting fees and all of its own expenses. Rather than communicating directly with Lippitz, Bletnitsky used Plotkin to relay information (advice) to Lippitz in order to protect LZ before the gaming board. Plotkin wrote e-mails to establishments to get them to substitute LZ for JAD.

¶ 26    The last witness was Thomas Minard, who testified as follows. In 2009, when Illinois legalized video gaming in bars and restaurants, Minard, whose experience was in sales and marketing, went to work for a California start-up company, Game Tech, that was going to distribute gaming equipment. After about two years, Minard had enough connections in Illinois to help a video gaming terminal operator from Pennsylvania, Paramount Gaming, build its Illinois route, which the company then sold before Illinois gaming went "live." Minard then became an establishment owner himself so he could learn that side of the gaming business.

¶ 27    While he owned that establishment in September 2013, he met Pat Ostry, who asked Minard to become LZ's consultant and help evaluate its "significant portfolio of locations." Ostry told Minard that none of LZ's gaming locations were "live," which Minard found hard to believe, because by then, Illinois gaming was "fairly up and operational" and there was "kind of a frenzy" where "everybody was rushing to turn on games as quickly as possible." LZ's roster of use agreements included locations in Chicago, which had "little to no value" because the municipality

had not opted into legalized gambling and it was doubtful that it would ever opt in. Minard visited some of the roster's other locations to evaluate their potential to be profitable gaming venues (to see, for instance, if they had space for enough terminals) or would even meet the statutory qualifications for video game terminal licensing (for instance, did they even have liquor licenses). After Minard evaluated about 50 locations, Ostry sent an e-mail to Lippitz in November 2013 stating that the entire portfolio that LZ had acquired from JAD had little to no value. Minard recommended that Lippitz try to "salvage" the roster by offering it to Accel, which had resources and was the fastest growing video gaming terminal company. The roster was not valuable to Accel, although it did agree to buy some of the locations. Minard also advised Lippitz about what it would take to build a gaming business, suggested he hire Michael, who was disenchanted with his then-employer and that he buy Tangent Gaming's route of 10 or 11 locations. Lippitz followed Minard's advice and also hired Minard as an employee. Lippitz invested more money in LZ, and then Minard, Ostry, and Michael built the company until it was sold in 2017.

¶ 28      On cross-examination by Bletnitsky's attorney, Minard said he looked at more than 50, perhaps 80, suburban locations that LZ had acquired from JAD, some of which were "ridiculously not even considerable" as gaming locations. He disagreed with counsel's suggestion that one venue could generate "hundreds of thousands of dollars [of revenue] if it's in the proper location."

¶ 29      When Minard's testimony concluded, there were two potential witnesses who would have testified about the extent of LZ's "net profits:" Joel Brown, who was LZ's accountant, and Alan Russo, who was also an accountant and Bletnitsky's purported expert. After Minard left the stand, however, the circuit court stated, "All right. If the other two witnesses are the witnesses who were going to testify as to net profits and profitability, I don't need to hear those witnesses."

¶ 30    Closing arguments were made. Then the circuit court took the case under advisement and subsequently issued a written judgment order in which it found that Lippitz was entitled to judgment on his breach of contract claim and also entered judgment in favor of Lippitz on Bletnitsky's counterclaim for breach of the AIP.

¶ 31    The circuit court summarized the basis for its conclusions. With respect to Lippitz's claim, the trial evidence included the parties' memorandum of understanding, promissory note, and loan agreement, and Lippitz also produced evidence of a $600,000 wire transfer from his account at Morgan Stanley Smith Barney to Bletnitsky's personal account. Lippitz and Bletnitsky testified that Bletnitsky received the $600,000 and did not repay it, but Bletnitsky argued that the $600,000 was not connected to the loan documents that Lippitz was relying upon. The circuit court rejected this argument and found that Lippitz's testimony about the loan was credible, while Bletnitsky's testimony "regarding the loan and purpose [of the loan] was, at times, confusing, contradictory, and not credible." This portion of the judgment is not in dispute.

¶ 32    As for Bletnitsky's counterclaim, the circuit court found that the AIP "never evolved into a final and enforceable agreement." The testimony indicated that Plotkin prepared the document and it was undisputed that the parties signed it. The document was signed five days after the gaming board's denial of JAD's gaming application. Lippitz testified that he was unaware of the denial at the time and Plotkin testified that Lippitz was, in fact, aware. Lippitz subsequently learned of the license denial and then agreed that his interest in JAD would be redeemed for cash and an assignment of some of JAD's video gaming location contracts. Lippitz also testified that after the denial, Bletnitsky and Plotkin came to Lippitz's house to discuss a contingency plan, which they presented in the AIP. Lippitz testified that he had not previously discussed or reviewed the AIP

with anyone and that he saw it as a possible contingency plan if he and Bletnitsky needed to change directions with JAD. The circuit court found that "Lippitz testified credibly that the AIP never evolved into a final agreement in fact and no evidence was presented to establish that a valid and enforceable agreement was ever reached." Plotkin testified that Lippitz was fully informed about the AIP and executed it with knowledge of its intent and effect, but Plotkin was not a credible witness. Plotkin also testified that Bletnitsky could not own any part of LZ because of the gaming board's determination that Bletnitsky was unsuitable. Plotkin further testified that he made efforts while preparing the AIP so as to keep its existence away from the attention of the board. The court concluded that "the AIP never evolved into a final valid and enforceable agreement," in part because "Bletnitsky and Plotkin knew when the AIP was presented [to Lippitz] that a 'final' AIP would run afoul [of gaming board's] rules and would either be unenforceable under [those] rules or would result in the denial or revocation of the LZ license." Furthermore, after signing the AIP, Lippitz reached the same conclusion. The parties never negotiated more definitive, specific, and enforceable terms.

¶ 33    Parad now asks that we reverse the circuit court's amended final judgment order as it relates to Bletnitsky's counterclaim and that we award millions of dollars in damages for Lippitz's breach of the AIP. But instead of arguing strengths and weaknesses that he perceives in the evidence and testimony, Parad focuses on the court's earlier decision to deny Lippitz's section 2-615 motion to dismiss Bletnitsky's counterclaim. He argues that the AIP is a binding contract, partly because the court "did not identify any contract formation elements missing  from the AIP which would affect [its] validity and enforceability" He also argues that the court's subsequent consideration should have been limited to the face of the contract, with no regard for any trial evidence or testimony,

because the court had not found that the AIP was ambiguous. See *Pappas v. Waldron*, 323 Ill. App. 3d 330, 338 (2001) ("If the language of the contract is unambiguous, the contract is interpreted as a matter of law without the aid of parol evidence."). He contends that the *de novo* standard governs our review of a question of "contract interpretation." See *Avery State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 129 (2005) (generally, contract interpretation poses a question of law subject to de novo review).

¶ 34    Parad points out that the section 2-615 order includes the statement that "the court finds that an enforceable contract exists between the parties for purposes of this motion." According to Parad, it was then error to consider parol evidence that contradicted this supposed earlier finding "that the AIP is an enforceable contract."

¶ 35    Parad misapprehends the extent of the ruling and he fails to cite authority and pages of the record that support his conclusion. Section 2-615 provides that a pleading or portion thereof may be stricken because it is substantially insufficient in law. 735 ILCS 5/2-615 (West 2000). That is, a motion filed under section 2-615 challenges the legal sufficiency of a pleading. *Cohen v. McDonald's Corp.*, 347 Ill. App. 3d 627, 632 (2004). After hearing Lippitz's section 2-615 motion, the circuit court found that Bletnitsky had "minimally" met the standards for stating a claim of breach of contract. Meaning only that Bletnitsky had sufficiently stated *allegations* of the elements of the formation of a contract, which were an offer, an acceptance, and consideration, as well as the other element of this type of claim, which was Lippitz's breach of the contract that had been formed. See *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 329 (1977) (offer, acceptance, and consideration are the basic ingredients of a contract). The circuit court even specified that "an enforceable contract exists between the parties *for the purposes of this motion*." When ruling on a

section 2-615 motion, the circuit court accepts as true all well-pled facts and all reasonable inferences to be drawn from those facts and determines whether the plaintiff's *allegations* are sufficient to state a claim upon which relief may be granted. *Cohen*, 347 Ill. App. at 632.

¶ 36    But making allegations and proving those allegations are not the same thing. Allegations are made on the face of a complaint, and proof of those allegations is provided through documentary evidence and testimony. When the circuit court ruled on the section 2-615 motion, it would have been impossible for it to determine that Bletnitsky had proven that there truly was an offer, an acceptance, consideration, and a breach of contract. At that early stage of the litigation, the circuit court did not have sufficient information to reach any such conclusions, was not asked to come to those conclusions, and could not have reached a sound decision about any of the four elements that Bletnitsky would eventually have to prove in order to be awarded a judgment in his favor. There is no statute, no precedent, and nothing in the record that supports Parad's argument that the section 2-615 ruling indicates that the AIP was an enforceable contract and that the circuit court had to subsequently "distinguish[], or expressly overrule[]" itself in order to subsequently consider the trial evidence. We reject Parad's contention that the section 2-615 order foreclosed the circuit court from later finding, at the close of evidence, that the AIP was not a binding, enforceable contract.

¶ 37    Instead, the circuit court based its decision on its evaluation of written documents and conflicting testimony regarding whether the AIP ever ripened into a binding contract. Accordingly, and contrary to Parad's contention about the *de novo* standard, the manifest weight standard is the applicable standard of review. The governing principles are well established:

        "In a bench trial, the trial court has the opportunity to weigh the evidence and make

findings of fact, including being in a superior vantage point from which to observe and judge witnesses' demeanor and credibility, while a reviewing court has only a cold record in which to govern its decision-making process. [Citation.] Consequently, a reviewing court will defer to the factual findings of the trial court unless they are against the manifest weight of the evidence. [Citation.] 'A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence.' [Citation.] 'A reviewing court should not overturn a trial court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion had it been the fact finder.' [Citation.] ' "The court on review must not substitute its judgment for that of the trier of fact." ' [Citation.]" *Flynn v. Maschmeyer*, 2020 IL App (1st) 190784, ¶ 70.

¶ 38 See also *Morehead v. Rock Tavern, Inc.*, 89 Ill. App. 2d 111, 114-15 (1967) (to be contrary to the manifest weight of the evidence, the opposite conclusion must be clearly evident); *Brody v. Finch University of Health Sciences/The Chicago Medical School*, 298 Ill. App. 3d 146, 153 (1998) ("The standard of review we apply when a challenge is made to the trial court's ruling following a bench trial is whether the trial court's judgment is against the manifest weight of the evidence. *** The trial court's finding must be given great deference because the trial court, as the trier of fact, is in an optimum position to observe the demeanor of witnesses while testifying, to judge their credibility, and to determine the weight their testimony should receive.")

¶ 39 Throughout his brief, Parad states that the AIP is an unambiguous, binding contract that contains all the "material terms." The AIP, however, contains vague, non-descript, conclusory and

conflicting terms that do not adequately set forth either Bletnitsky's or Lippitz's purported obligations and the terms do not amount to a binding and enforceable contract.

¶ 40    For a written agreement to be enforceable, there must be a meeting of the minds as to the terms by the two contracting parties. *Academy Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 30 (1991). A contract may be enforced even though some terms are missing, "but if the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *Academy Chicago Publishers*, 144 Ill. 2d at 30 ("Without setting forth adequate terms for compliance, the publishing agreement provides no basis for determining when breach has occurred, and, therefore, is not a valid and enforceable contract."). If the contract terms are "too uncertain or indefinite to enforce," a contract has not been formed. *Babbitt Municipalities, Inc. v. Health Care Services Corp.*, 2016 IL App (1st) 152662, ¶ 30.

¶ 41    The AIP states that Lippitz would "share the net profits earned from [LZ] with [Bletnitsky]," and give Bletnitsky 70% of the net profits in LZ. The AIP does not define "net profits" or provide any basis for making that calculation. The AIP further states that Lippitz would be sharing the "net profits" with Bletnitsky as a "personal gift" reflecting Lippitz's "appreciation" for Bletnitsky's "long term friendship" and Bletnitsky's "advice" and "help" in Lippitz's development and operation of the yet to be formed LZ. Thus, the AIP indicates that Bletnitsky is to be compensated with "net profits" for providing his valuable services of "advice" and "help," yet also indicates that the sharing of "net profits" is a "gift," that is, a donation to Bletnitsky. See *Moniuszko v. Moniuszko*, 238 Ill. App. 3d 523, 529 (1992) ("A 'gift' is a voluntary, gratuitous transfer of property by one person to another where the donor manifests an intent to make such a gift and absolutely and irrevocably delivers the property to the donee."). These are conflicting,

nonsensical terms. Furthermore, the AIP does not indicate how, when, or how frequently Bletnitsky is to provide "advice" and "help" to Lippitz, or when the "advice" and "help" is sufficient or adequate. Nor does it define the meaning of "advice" and "help." The AIP was purportedly an agreement "in perpetuity for as long as the newly formed Terminal Operator Company remain[ed] in business." However, the AIP also states that Bletnitsky would have "no interest or control" in LZ. Not only does the AIP contain conflicting, confusing language, it lacks essential, certain terms from which to determine whether "the agreement has been kept or broken," and is not an enforceable contract. *Academy Chicago Publishers*, 144 Ill. 2d at 30; *Babbitt Municipalities*, 2016 IL App (1st) 152662, ¶ 30. Moreover, none of the witness testimony supplied any missing, essential terms of an enforceable contract. There is more than sufficient evidence to support the circuit court's finding that the AIP was not a binding, enforceable agreement. It would be impossible to come to the opposite conclusion as the circuit court. Accordingly, we affirm the judgment in Lippitz's favor and against Bletnitsky as to Bletnitsky's claim for breach of the AIP.

¶ 42 Because we are affirming the circuit court's determination that the AIP was not a valid contract, we need not reach the parties' arguments as to whether Bletnitsky waived or was estopped from asserting his contractual rights under the AIP because he delayed in making a written demand for payment for so many years.

¶ 43 Lippitz filed a motion to strike pages A51, A55, A56, and A57 of Parad's amended appendix, as the trial judge did not admit these documents into evidence, and to also strike the portions of Parad's reply brief which cite and rely on these four pages. This motion was taken with the case. Page A51 is purportedly information that Parad culled from the Illinois Gaming Board's website and incorporated into a document that he entitled "Illinois Gaming Board Video Gaming

Report – Statewide Allocation Detail, SUMMARY OF ANNUAL LZ REVENUE FROM JAD-TRANSFERRED LOCATIONS." Pages A55-A57 contain the opinions of attorney Cory Aronovitz regarding this litigation and which Parad summarizes as "$50,000/location – Precious JAD's Assets - Unlicensed Operator's Agreements Poached by Competitors." All of these pages are about Bletnitsky's damages for breach of contract. Our ruling on the manifest weight of the evidence moots the issues that are presented by these exhibits and arguments. Accordingly, the motion taken with the case is denied as moot. See *Dewey v. Zack*, 272 Ill. App. 3d 742, 750 (1995) (denying as moot a motion taken with the case to strike portions of appellate briefs).

¶ 44    Based on the above analysis, we affirm the judgment of the circuit court. The motion taken with the case was denied as moot.

¶ 45    Affirmed; motion taken with the case denied.